NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 19a0587n.06

Case No. 18-2253

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| CROSSING AT EAGLE POND APARTMENTS, LLC, | ) ) ) | |
| Plaintiff-Appellant, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| v. | ) ) | |
| LUBRIZOL CORPORATION; LUBRIZOL ADVANCED MATERIALS, INC., | ) ) ) | |
| Defendants-Appellees. | ) | |

BEFORE: CLAY, STRANCH, and MURPHY, Circuit Judges.

MURPHY, Circuit Judge. When a buyer has purchased a defective good but has suffered only "economic" (as opposed to "physical") injuries as a result, the buyer typically cannot avoid the contractual limits on the remedies available against the seller by bringing a tort suit rather than a contract suit. Instead, the buyer must protect itself at the time of the parties' contract negotiations by demanding warranties or similar safeguards against the risk that the product turns out to be a lemon. This principle, known as the "economic-loss doctrine," has been Michigan law since at least *Neibarger v. Universal Cooperatives, Inc.*, 486 N.W.2d 612 (Mich. 1992).

We must decide whether the doctrine applies to an apartment building's leaky pipes. The Crossing at Eagle Pond, LLC ("Eagle Pond") owns the building that suffered the pipe failures. It blames Lubrizol Advanced Materials, Inc., and its parent company for the leaks. (We refer to the

defendants collectively as "Lubrizol" because their corporate distinction does not matter to our outcome.) Eagle Pond brought a products-liability suit against Lubrizol, alleging that it sold a defective chemical compound to the manufacturer that made the building's pipes and that this compound caused the pipe failures. The district court found that the economic-loss doctrine barred this tort suit and granted summary judgment to Lubrizol. On appeal, Eagle Pond offers various reasons why the economic-loss doctrine should not apply: it did not have a contract with Lubrizol; this case involves real property, not goods; and the leaks caused damage to more than just the pipes. Because we think the Michigan Supreme Court would reject these arguments, we affirm.

I.

Located on the outskirts of Detroit in Walled Lake, Michigan, the Crossing at Eagle Pond Apartments (the "Apartments") contains 201 units over four floors. This apartment building has changed hands several times over the years. A family initially constructed the Apartments in the late 1990s. But the lender that fronted the construction costs eventually foreclosed on this family, and Walled Lake Granite LLC bought the Apartments out of the ensuing receivership. In October 2011, five limited liability companies (the "LLCs") owned by the Bleznak Real Estate Investment Group purchased the Apartments from Walled Lake Granite through a "like-kind exchange" involving another property. In January 2016, the Bleznak Group created Eagle Pond and transferred the Apartments from the LLCs to this new entity, although the owners retained the same ownership shares in the Apartments after this transfer.

Before the LLCs purchased the Apartments, Walled Lake Granite informed the LLCs' owners, including Adam Bleznak, that the building had suffered plumbing leaks. While Bleznak and the other owners thought that this "was a problem that [they] were going to have to deal with," they "didn't feel that it was a big enough problem . . . to walk away from closing the deal." They

"did not hire a master plumber" or investigate the leaks in detail. Rather, they were "comfortable that anything that would come up in the future, [they] would be able to remedy," believing that the leaks represented "normal property management challenges."

Their belief proved mistaken. The pipes suffered what Bleznak described as "four major failures" within two years. The first occurred almost immediately after the LLCs bought the building in October 2011. In June 2013, after the fourth leak, the LLCs' owners realized that they had a larger problem and decided to replace all of the building's pipes at a price tag of $545,739. The company that the LLCs hired to conduct the replacement work recommended that an engineer test the old pipes to identify the source of their problems. According to Eagle Pond, which was assigned the LLCs' rights after the ownership transfer, those tests revealed that the pipes had become brittle and that their "embrittlement" had caused the failures.

This finding led Eagle Pond to Lubrizol. Lubrizol makes "chlorinated polyvinyl chloride" resins and compounds for use in plumping pipes and fittings. It sells its compounds to pipe manufacturers, not to downstream contractors or consumers. Eagle Pond believed that the materials Lubrizol provided to the manufacturer that made the Apartments' pipes caused their "defective embrittlement." It brought a products-liability suit against Lubrizol in Michigan state court. The complaint sought, among other damages, "the cost of replacing the piping throughout the apartment complex." After removing this suit to federal court on the basis of diversity jurisdiction, Lubrizol moved for summary judgment. Lubrizol argued that the economic-loss doctrine barred Eagle Pond's tort suit and that any potential contract claim had expired under the Uniform Commercial Code's statute of repose. Lubrizol added that, even if the economic-loss doctrine did not apply, Michigan's three-year statute of limitations for products-liability claims

had run. The district court agreed on all fronts. Eagle Pond now appeals all of these rulings, but we can resolve this appeal on the basis of the economic-loss doctrine alone.

II.

Michigan's economic-loss doctrine prohibits buyers from bringing tort suits against sellers for economic losses arising from the product that the parties exchanged in a commercial context. *See Neibarger v. Universal Coops., Inc.*, 486 N.W.2d 612, 615 (Mich. 1992). The phrase "economic loss" generally refers to non-physical commercial losses (like the money spent on a faulty product or the lost sales caused by its poor performance) in contrast to the injuries that have long been the central domain of tort law: physical injuries "to the plaintiff's person or property (property other than the product itself)." *Miller v. U.S. Steel Corp.*, 902 F.2d 573, 574 (7th Cir. 1990).

Courts developed the economic-loss doctrine to keep a clear line between tort and contract law, two common-law areas that serve distinct purposes. On the one hand, tort law imposes duties of care that all people owe to each other (whether or not they have a contractual relationship) in order to discourage negligent conduct and the physical injuries that it can cause. *See Neibarger*, 486 N.W.2d at 615. Designed to ameliorate the "accident problem," *McCann v. Brody-Built Const. Co.*, 496 N.W.2d 349, 352 (Mich. Ct. App. 1992) (Griffin, J., concurring in part and dissenting in part), tort law generally does not allow parties to reallocate through their contracts the substantive legal rules that it creates. *See Detroit Edison Co. v. NABCO, Inc.*, 35 F.3d 236, 239 (6th Cir. 1994). On the other hand, contract law "operates on the premise that commercial actors, because of their ability to bargain for the terms of the sale, will be able to allocate the risks and costs of a product's potential nonperformance." *Id.* Thus, contracting parties, through their negotiations, generally may allocate either to the buyer or to the seller the economic risk that a

product will "prove[] to be faulty." *Neibarger*, 486 N.W.2d at 616. If the buyer believes that it can more cheaply ensure against that risk through private insurance, it can agree to "disclaimers" or a "limitation of remedies" in exchange for a lower price. *See id.* If the buyer cannot do so, it can seek "warranties" from the seller in exchange for a higher price. *See id.*

The economic-loss doctrine responds to the reality that one of these two bodies of law (tort) is not subject to the party's negotiations whereas the other one (contract) is. If a disgruntled buyer could avoid the contract's allocation of the risk that a product will turn out to be defective by suing in tort when the product fails, tort law's duties of care would erode the areas over which the parties may bargain. *Id.* at 618. What rational seller would give a price discount to the buyer for bearing the risk of a product's poor performance if the buyer could simply claim a breach of tort law's non-negotiable duties whenever that risk came about? By barring tort recoveries for economic harms, the doctrine preserves a "negotiation zone" in which the parties may bargain—allowing them to allocate the risk of "economic" losses as they see fit (without worrying that tort law will later upend the deal). *See Tyson v. Sterling Rental, Inc.*, 836 F.3d 571, 581–82 (6th Cir. 2016). In short, the economic-loss doctrine prevents "contract law [from] drown[ing] in a sea of tort." *East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 866 (1986).

In at least two ways, Michigan courts have broadened the economic-loss doctrine beyond the "paradigmatic" case of a buyer who contracts with a seller for a poor product and then seeks to use tort law to obtain a refund of the purchase price.

Expansion One: In Michigan, the economic-loss doctrine bars tort claims that seek to recover not just for losses to the *product itself* but also for foreseeable losses to *other property*. *Neibarger*, 486 N.W.2d at 619–20. When adopting this broader rule, the Michigan Supreme Court reasoned that, "[i]n many cases, failure of the product to perform as expected will necessarily cause

damage to other property." *Id.* at 620. The court thus sought to allow commercial parties to negotiate over which side will bear the risk of this additional property damage and incorporate that risk allocation into the contract price. *See id.* Applying this rule, the court held that a dairy farm that contracted for what turned out to be a defective milking system could not recover in tort for the injuries that the system caused the dairy farm's cows (the "other property"). *See id.* at 620–21.

Expansion Two: A long line of Michigan cases has applied the economic-loss doctrine to bar a commercial plaintiff's tort suit against a product manufacturer even though the plaintiff did not directly contract with the manufacturer. *See Fed. Ins. Co. v. Conbraco Indus., Inc.*, Nos. 274351, 274421, 2008 WL 1959059, at *2–3 (Mich. Ct. App. May 6, 2008) (per curiam); *MASB-SEG Prop./Cas. Pool v. Metalux*, 586 N.W.2d 549, 551, 553–54 (Mich. Ct. App. 1998); *Citizens Ins. Co. v. Osmose Wood Preserving, Inc.*, 585 N.W.2d 314, 316 (Mich. Ct. App. 1998); *Affiliated FM Ins. Co. ex rel. Motor City Stamping, Inc. v. Abolite Lighting, Inc.*, No. 193016, 1998 WL 1997669, at *3 & n.8, *9 (Mich. Ct. App. Mar. 20, 1998) (per curiam); *Sullivan Indus., Inc. v. Double Seal Glass Co.*, 480 N.W.2d 623, 628–29 (Mich. Ct. App. 1991). While "a series of commercial decisions and transactions" separated the commercial plaintiff from the commercial defendant in these cases, *Conbraco Indus.,* 2008 WL 1959059, at *3, the courts still rejected tort suits seeking economic losses because "it would poorly serve the commercial expectations bolstered by the [doctrine] to permit a tort recovery when each transaction in the series of events had a commercial nature," *Cincinnati Ins. Co. v. Butler Mfg. Co.*, No. 240463, 2003 WL 22204734, at *1 (Mich. Ct. App. Sept. 23, 2003) (per curiam). The doctrine's purpose (to give parties the ability to negotiate over the risk of a faulty product) holds in this setting because the commercial plaintiff may protect itself through "ordinary contractual remedies," *Conbraco Indus.*, 2008 WL

1959059, at *3, even if those remedies run against an entity in the distribution chain other than the manufacturer itself. *Cf. Rardin v. T & D. Mach. Handling, Inc.*, 890 F.2d 24, 28 (7th Cir. 1989).

Michigan courts, for example, have applied this principle to a commercial real-estate owner's tort suit alleging that its real estate was harmed by a defective product added to the property. *See MASB-SEG*, 586 N.W.2d at 553–54; *Citizens Ins.*, 585 N.W.2d at 316. *Citizens Insurance* provides the best example. There, the plaintiff, a restaurant owner's insurer, sued a manufacturer of flame-retardant chemicals in tort, claiming that the chemicals caused the restaurant's roof to collapse. 585 N.W.2d at 315. The restaurant owner had contracted with a builder that, in turn, had used the defendant's chemicals on the roof. *Id.* The insurer argued that the economic-loss doctrine should not apply because the restaurant owner did not contract with the chemical manufacturer and so "was not in a position to negotiate the terms of the sale." *Id.* at 316. The state court disagreed. *Id.* It held that the economic-loss doctrine barred a tort suit because the owner was a "commercial business" and the defendant sold its products "for commercial purposes." *Id.* Thus, the "exclusive" remedy was in contract. *Id.*

The logic of these Michigan cases extends to Eagle Pond's tort suit too. To begin with, Eagle Pond sued for economic losses (the cost of replacing the pipes) and for the harm that the pipe failures caused to nearby property. Both types of damages fall within Michigan's economic-loss doctrine. *See Neibarger*, 486 N.W.2d at 620. Indeed, when the Michigan Supreme Court held that commercial parties can predict that defective products may cause damage to other property, it listed as an example a "leaking roof" that "caused water damage to other parts of an apartment building." *Id.* at 620 & n.27 (citing *Chicago Heights Venture v. Dynamit Nobel of Am., Inc.*, 782 F.2d 723 (7th Cir. 1986)). Replace the roof with the pipes and that case might as well be this one.

In addition, while Eagle Pond did not have a contract with Lubrizol, it does not dispute that every party connecting it (and the LLCs) to Lubrizol was a commercial entity. The LLCs bought the Apartments for a commercial purpose and could have negotiated with Walled Lake Granite during the deal to protect themselves from any defects on the premises. *See Citizens Ins.*, 585 N.W.2d at 316. Yet when the LLCs' owners learned of potential plumbing problems, they opted to close the deal apparently without obtaining any warranties from Walled Lake Granite. The economic-loss doctrine would apply to Lubrizol's initial sale to the pipe manufacturer, and Michigan courts have not allowed a downstream commercial purchaser to avoid the doctrine merely because of "the fortuity of a resale" of the product. *Motor City Stamping*, 1998 WL 1997669, at *9–10. Where, as here, each party in the distribution chain could have protected itself through contract, the doctrine applies in Michigan even if the "chain of commercial transactions" is a long one. *Cincinnati Ins.*, 2003 WL 22204734, at *2.

Eagle Pond offers several rejoinders, all of which are foreclosed by Michigan precedent. *First*, it argues that it purchased an *apartment building*, not a *product*, and that the economic-loss doctrine should not cover real-estate purchases because they fall outside the Uniform Commercial Code. The Michigan Supreme Court has yet to opine on whether the doctrine extends to real-estate deals. *Compare Flynn v. Damal*, No. 1:98-cv-483, 1999 WL 35655608, at *5–6 (W.D. Mich. Aug. 6, 1999), *and McCann*, 496 N.W.2d at 351–52 (Griffin, J., concurring in part and dissenting in part), *with Encana Oil & Gas, Inc. v. Zaremba Family Farms, Inc.*, No. 1:12-cv-369, 2013 WL 12177022, at *13 (W.D. Mich. Dec. 3, 2013). But we need not make a prediction about how it would rule on that issue.

Even assuming the economic-loss doctrine does not cover real-estate contracts, Michigan cases have looked to the *defendant's sale*—not the *plaintiff's purchase*—when deciding whether

to apply the doctrine. As noted, Michigan courts have refused to allow real-estate owners to recover for property damage caused by a product added to the land. *MASB-SEG*, 586 N.W.2d at 553–54 (technology center); *Citizens Ins.*, 585 N.W.2d at 316 (restaurant); *Motor City Stamping*, 1998 WL 1997669, at *6–9 (manufacturing building). These cases did not consider whether the economic-loss doctrine applied to real-estate sales because the defendant in each case sold a product. *MASB-SEG*, 586 N.W.2d at 553–54 (fluorescent light); *Citizens Ins.*, 585 N.W.2d at 316 (flame-retardant chemical); *Motor City Stamping*, 1998 WL 1997669, at *6–9 (light fixture and component parts). This reasoning reaches this case. Eagle Pond seeks to recover for damages to real estate (the Apartments) based on Lubrizol's sale of a product (a chemical compound).

*Second*, Eagle Pond argues that the real-estate owners in these cases *themselves* purchased the defective product that was incorporated into their real estate (even if they did not purchase it directly from the manufacturer), whereas a different real-estate owner, not Eagle Pond, purchased the defective pipes that made their way into the Apartments. This distinction is factually mistaken and legally irrelevant. Factually, Eagle Pond's argument does not distinguish Michigan cases in which the plaintiff itself did not add the defendant's allegedly defective product to the real estate. Like Eagle Pond, for example, the real-estate owner in *Motor City Stamping* bought the manufacturing building only after a prior owner had added the defective light fixtures to the building, but the court applied the economic-loss doctrine nonetheless. 1998 WL 1997669, at *1, *6; *see also Cincinnati Ins.*, 2003 WL 22204734, at *1–2.

Legally, Eagle Pond fails to explain why its factual distinction should matter for purposes of the economic-loss doctrine. Were we to accept its view, a real-estate owner who uncovers that a defective product has been incorporated into its property could sell the property to allow the new purchaser to avoid the economic-loss doctrine that would otherwise apply to the damages that the

9

product caused. Yet Eagle Pond does not explain why a manufacturer's liability in tort should depend on this mere "fortuity of a resale." *Motor City Stamping*, 1998 WL 1997669, at \*9. The economic-loss doctrine exists to allow parties to arrange their affairs through contract, and the LLCs in this case could have protected themselves through their contract with Walled Lake Granite. That exchange provided the "potential contractual relief" that Michigan's economic-loss doctrine requires. *Cincinnati Ins.*, 2003 WL 22204734, at \*2.

Eagle Pond's two contrary cases do not create a different rule. *Quest Diagnostics, Inc. v. MCI WorldCom, Inc.*, 656 N.W.2d 858 (Mich. Ct. App. 2002), held that the economic-loss doctrine did not apply to an "accident" that fell within tort's traditional domain. When doing underground work, the defendants ruptured a water main and left many individuals and businesses without water. *Id.* at 860 & n.1. No chain of contracts connected the defendant's sale of goods to the plaintiffs. In fact, there "was 'no underlying sale of goods'" at all. *SEMCO Energy, Inc. v. Eclipse, Inc.*, No. 306644, 2012 WL 6049655, at \*4 n.4 (Mich. Ct. App. Dec. 4, 2012) (per curiam) (quoting *Quest*, 656 N.W.2d at 863). In this case, by contrast, Lubrizol did sell a product, and a chain of contracts connects it to Eagle Pond—even if the last "link[s]" in the chain were real-estate deals. *Cincinnati Ins.*, 2003 WL 22204734, at \*2. This case is thus like *Cincinnati Insurance* and *Motor City Stamping*, not *Quest*.

Eagle Pond fares no better with *River House at Bridgewater Place Condominium Association v. Bridgewater Condos, L.C.*, No. 14-03282-NZB, 2014 Mich. Cir. LEXIS 157 (Mich. Cir. Ct. Dec. 12, 2014). There, a trial court held that the economic-loss doctrine did not apply when condominium owners sued a pipe manufacturer after pipes in the condominiums leaked. *Id.* at \*4–7. Yet the condo owners in *River House*—unlike Eagle Pond—were not "commercial business[es]" engaged in a "commercial purpose." *Citizens Ins.*, 585 N.W.2d at 316. The court

expressed concern that the owners "had no idea that their entire investment in their residences could be put at risk by repeated flooding . . . ." *River House*, 2014 Mich. Cir. LEXIS 157, at \*6. And while some Michigan cases hold that the economic-loss doctrine applies to transactions involving consumers (like the condo owners), *see Sherman v. Sea Ray Boats, Inc.*, 649 N.W.2d 783, 788–90 (Mich. Ct. App. 2002), we need not consider whether the Michigan Supreme Court would apply the doctrine to *River House*'s consumer context. The doctrine has always applied in full to this case's business context. *See Detroit Edison*, 35 F.3d at 242.

*Third*, Eagle Pond argues that it suffered injuries to more than just the pipes because the leaks damaged other property, including carpeting, floor boards, and ceiling tiles, and displaced Eagle Pond's tenants (whom it presumably had to compensate). Yet any funds that Eagle Pond spent to reimburse its tenants are prototypical "economic" losses. *See Neibarger*, 486 N.W.2d at 621. And while some jurisdictions limit the economic-loss doctrine to claims for damages to the defective product alone, *see Saratoga Fishing Co. v. J.M. Martinac & Co.*, 520 U.S. 875, 877 (1997), the Michigan Supreme Court has long held that the doctrine applies to foreseeable damage to other property, *see Neibarger*, 486 N.W.2d at 619–20. Eagle Pond understandably would prefer that we apply the version of the economic-loss doctrine that the Supreme Court has adopted for admiralty cases, *see Saratoga Fishing*, 520 U.S. at 877, but we must follow the Michigan Supreme Court's instructions in this diversity suit, *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). Under Michigan law, the economic-loss doctrine bars Eagle Pond's request to recover all of its alleged damages in tort.

We affirm.