RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 16a0218p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT
_____

SeTara Tyson,

     *Plaintiff-Appellee/Cross-Appellant* (15-1465 & 15-1468),

     *v.*

Sterling Rental, Inc., dba Car Source,

     *Defendant-Appellant/Cross-Appellee* (15-1465 & 15-1468),

Al Chami; Rami Kamil,

     *Defendants-Appellees* (15-1468).

> Nos. 15-1465/1468

_____

Appeal from the United States District Court
for the Eastern District of Michigan at Ann Arbor.
No. 5:13-cv-13490—Judith E. Levy, District Judge.

Argued: August 4, 2016

Decided and Filed: September 2, 2016

Before: BOGGS, CLAY, and SUTTON, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Ziyad Kased, KASED LAW, PLLC, Troy, Michigan, for Appellant/Cross-Appellee in 15-1465 and 15-1468 and for Appellees in 15-1468. Deepak Gupta, GUPTA WESSLER PLLC, Washington, D.C., for Appellee/Cross-Appellant. **ON BRIEF:** Ziyad Kased, KASED LAW, PLLC, Troy, Michigan, for Appellant/Cross-Appellee in 15-1465 and 15-1468 and for Appellees in 15-1468. Deepak Gupta, GUPTA WESSLER PLLC, Washington, D.C., Ian B. Lyngklip, LYNGKLIP & ASSOCIATES, Southfield, Michigan, for Appellee/Cross-Appellant.

---

**OPINION**

---

CLAY, Circuit Judge.　In this case arising out of the sale of an automobile, Defendants Sterling Rental, Inc., dba Car Source ("Car Source"), Al Chami, and Rami Kamil appeal from the district court's order granting Plaintiff SeTara Tyson summary judgment on her claim that Defendants violated the Equal Credit Opportunity Act ("ECOA" or "the Act"), 15 U.S.C. § 1691 *et seq.*, by changing the terms of her credit arrangement without providing a written notice setting forth the specific reasons.[1]　Plaintiff cross-appeals, arguing that the district court erred by: (1) holding that private parties may not obtain injunctive relief under the ECOA; and (2) granting Defendants' motion for summary judgment as to Plaintiff's claims for conversion on the basis that such claims are barred by Michigan's economic loss doctrine.

For the reasons set forth below, we **AFFIRM** the district court's grant of summary judgment in favor of Plaintiff on her ECOA claim; we **REVERSE** the district court's determination that injunctive relief was not available to Plaintiff under the ECOA, and we **REMAND** for an initial determination of whether such relief is warranted; and we **REVERSE** the district court's grant of summary judgment in favor of Defendants on Plaintiff's statutory conversion claims and **REMAND** for further proceedings on those claims.

**BACKGROUND**

**Factual History**

On August 10, 2013, Plaintiff purchased a used 2006 Chevrolet Cobalt from Car Source for $8,525.00.　Plaintiff could not afford to pay that price outright, but she was able to put

---

[1]The district court's order also granted summary judgment to Plaintiff on two additional claims that she brought under Michigan's Motor Vehicle Sales Finance Act ("MVSFA"), Mich. Comp. Laws § 492.101 *et seq.*, and the Michigan Credit Reform Act ("MCRA"), Mich. Comp. Laws § 445.1851 *et seq.*　However, Defendants' briefing before this Court does not identify those claims as issues presented for review; nor does Defendants' briefing provide any argument on those claims.　Thus, any challenges to the district court's grant of summary judgment to Plaintiff on her MVSFA and MCRA claims are deemed forfeited.　*See* Fed. R. App. P. 28(a) (stating that an appellant's brief must include "a statement of the issues presented for review" and argument on those issues); *Brindley v. McCullen*, 61 F.3d 507, 509 (6th Cir. 1995) ("We consider issues not fully developed and argued to be waived.").

$1,248 towards a down payment with the help of a grant from the state of Michigan. Defendants told Plaintiff that she had been approved for financing of the remainder of the vehicle's purchase price. To aid in the preparation of a financing agreement, Plaintiff provided Car Source salesman Rami Kamil with copies of her two most recent pay stubs, as well as a recent bank statement. With these documents in hand, Kamil entered Plaintiff's financial information— including the date she began working at her job, her year-to-date earnings, and the fact that she received paychecks every two weeks—into a computer program called "CAPS" provided to Car Source by non-party Credit Acceptance Corporation ("CAC"). Using the data entered by Kamil, CAPS calculated that Plaintiff's monthly income was approximately $1,817.38.

The parties do not dispute that this estimate of Plaintiff's monthly income was incorrect. In fact, Plaintiff's pay stubs indicated that her actual income was closer to $900 per month. CAC's designated representative, Jon Lun, later testified at deposition that based on his knowledge of the CAPS software, it appeared that Kamil had entered Plaintiff's information into the program incorrectly. Lun opined that had Kamil used CAPS correctly, the information on Plaintiff's pay stubs would have accurately estimated her monthly income. For his part, Kamil asserted during deposition that Plaintiff told him she was paid about $900 every two weeks; thus, he had no reason to question CAPS's estimate that Plaintiff's monthly income was $1,817.38.

Kamil thereafter used CAPS to "structure" a financing agreement by setting the price of the vehicle, the amount of Plaintiff's down payment, the APR, and the amount of monthly payments. Kamil stated that he structured the agreement so that Plaintiff's monthly payments would stay below a certain dollar amount, calculated by CAPS, that was a set percentage of Plaintiff's estimated monthly income. According to Kamil, so long as Plaintiff's monthly payments stayed below that specified amount, the financing agreement would be "funded" by CAC. Kamil explained that after a financing agreement was structured by Car Source, Car Source would assign the agreement to CAC, which would then "fund" the agreement by paying Car Source an advance. However, in the event the terms of the financing agreement were not acceptable to CAC, CAC would not issue an advance and would only collect monthly payments. In that scenario, the purchaser's monthly payments would go towards a "pool" of loans assigned

to CAC, and Car Source would receive profits on a "zero-advance" agreement only after CAC had been reimbursed for the advances paid to Car Source on all the agreements in the pool.

Kamil testified that in addition to maximizing the chance of receiving an advance on Plaintiff's financing agreement, he structured the agreement with the goal of keeping Plaintiff's monthly payments near the maximum amount allowed by CAC. Keeping the payments high, he explained, would help to cover his credit risk. With these goals in mind, Kamil manipulated the APR on the loan until CAPS's calculations suggested that ideal terms had been achieved. Under those terms, which were based on the incorrect estimate of Plaintiff's income and her $1,248 deposit, the APR on Plaintiff's loan was set at 24.49%.

When the terms of Plaintiff's financing agreement had been finalized, Kamil used the CAPS software to generate two physical documents: a Retail Installment Contract (the "RIC") and a "multi-state application" for credit from CAC (the "credit application"). On the first page of the two-page credit application, Plaintiff's monthly income was listed as $1,817.38. The second page of the application stated that by signing, Plaintiff was "certify[ing] that the above information is complete and accurate." (R. 33-1, PageID 310.) Plaintiff signed the document, but the parties dispute whether the first page of the credit application was attached at that time. Plaintiff also signed the RIC, which contained the material terms of the financing agreement and listed Car Source as the "Creditor-Seller." (R. 33-2, PageID 312.) Notably, the RIC contained a clause automatically assigning the contract to CAC upon execution. Finally, Plaintiff signed an "RD-108" form prepared by Car Source, which operated to register Plaintiff's title to the vehicle with Michigan's Secretary of State. After the paperwork had been signed, Plaintiff received the keys to the car and a receipt; she left the dealership in her new car that day.

The precise circumstances surrounding what happened next are disputed by the parties. It is undisputed, however, that Plaintiff drove her car back to Car Source on August 12, 2013—two days after the sale—in response to a phone call from Kamil. When Plaintiff arrived at the dealership, a Car Source employee told her that the RIC would need to be modified. It seems that during those two intervening days, CAC informed Car Source that it would not be paying an advance on the financing agreement due to the discrepancy in Plaintiff's monthly income. Plaintiff was given an invoice stating that under her new financing agreement, she would need to

put an additional $1,500 towards a down payment. Plaintiff declined to sign the new agreement and ultimately left the Cobalt with Car Source.

Plaintiff paints a more troubling picture of that day's events. She asserts that she returned to Car Source on August 12, 2013, after Kamil called and told her that her car required a new GPS unit, and that without the unit her car might shut off without warning. She was also informed that Car Source had a new contract for her to sign, under which she would make lower monthly payments. Plaintiff testified that she traveled to the dealership and parked outside; she entered the showroom and gave her keys to a Car Source employee. At that point, she was asked to produce her copy of the RIC. When Plaintiff responded that she had not brought her copy, the employee began "yelling and swearing" at her. Plaintiff states that a porter then retrieved the personal belongings in the Cobalt and "dumped them" at her feet. According to Plaintiff, she was told that if she wanted her car back, she would have to make an additional payment of $1,500.

Importantly, it is undisputed that Plaintiff was never provided with written notice explaining why the terms of her credit arrangement had been or needed to be changed. In fact, Kamil testified at deposition that Car Source never "issue[s] adverse action notices" informing customers that "they've been denied credit and telling them why."

**Procedural History**

Plaintiff filed suit against Defendants in federal district court on August 14, 2013—two days after leaving her car with Car Source. Her complaint alleged that she was entitled to damages and injunctive relief for, *inter alia*: (1) Car Source's failure to provide an adverse action notice as required under the ECOA, 15 U.S.C. § 1691(d); and (2) Defendants' conversion of the vehicle under Michigan common law and Mich. Comp. Laws § 600.2919a. After the completion of discovery, the parties filed cross-motions for summary judgment. The district court granted Plaintiff's motion as to her claims brought under the ECOA, holding that undisputed evidence in the record established Car Source's status as a "creditor" subject to the ECOA's adverse action notice requirement, and that Car Source admitted that it never issues such notices. However, the district court denied Plaintiff's request for an injunction, holding that as a matter of law,

equitable relief is not available to private parties under the ECOA.  The court also partially granted Defendants' motion and dismissed Plaintiff's claims for conversion, holding that such claims were barred by Michigan's "economic loss doctrine."  The court denied the parties' motions for reconsideration.

The parties thereafter agreed to resolve all remaining claims by stipulation, and the district court entered an order to that effect.  The parties timely appealed.

## DISCUSSION

### I.      Standard of review

We review a district court's grant of summary judgment *de novo*.  *Little v. BP Expl. & Oil Co.*, 265 F.3d 357, 361 (6th Cir. 2001).  A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute of material fact is genuine so long as "the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Ford v. Gen. Motors Corp.*, 305 F.3d 545, 551 (6th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "The district court, and this Court in its review of the district court, must view the facts and any inferences reasonably drawn from them in the light most favorable to the party against whom judgment was entered."  *Kalamazoo Acquisitions, L.L.C. v. Westfield Ins. Co., Inc.*, 395 F.3d 338, 342 (6th Cir. 2005) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

### II.     Plaintiff's claims under the ECOA

Originally enacted in 1974, the ECOA prohibits creditors from discouraging or discriminating against any credit applicant "with respect to any aspect of a credit transaction . . . on the basis of race, color, religion, national origin, sex or marital status, or age."  15 U.S.C. § 1691(a); *see also RL BB Acquisition, LLC v. Bridgemill Commons Dev. Grp., LLC*, 754 F.3d 380, 383 (6th Cir. 2014) ("Congress enacted [the] ECOA in 1974 to eradicate credit discrimination waged against women, especially married women whom creditors traditionally refused to consider for individual credit." (internal quotation marks omitted)).  In 1976, Congress

amended the ECOA to include a provision requiring creditors to provide applicants with written notice of the specific reasons why an adverse action was taken in regards to their credit. *See* 15 U.S.C. § 1691(d)(2)–(3); *see also Treadway v. Gateway Chevrolet Oldsmobile Inc.*, 362 F.3d 971, 975 (7th Cir. 2004). The Senate report accompanying the 1976 amendment indicates that in addition to further discouraging discriminatory practices, the notice requirement is intended to provide consumers with a "valuable educational benefit" and to allow for the correction of possible errors "[i]n those cases where the creditor may have acted on misinformation or inadequate information." S. Rep. No. 94-589, at 4 (1976).

Notwithstanding these purposes, our analysis of the ECOA's notice requirement must begin with the statutory text. *Lewis v. United States*, 445 U.S. 55, 60 (1980). Under 15 U.S.C. § 1691(d)(2) and (3):

> (2) Each applicant [for credit] against whom adverse action is taken shall be entitled to a statement of reasons for such action from the creditor. A creditor satisfies this obligation by—
>
> > (A) providing statements of reasons in writing as a matter of course to applicants against whom adverse action is taken; or
> >
> > (B) giving written notification of adverse action which discloses (i) the applicant's right to a statement of reasons within thirty days after receipt by the creditor of a request made within sixty days after such notification, and (ii) the identity of the person or office from which such statement may be obtained. Such statement may be given orally if the written notification advises the applicant of his right to have the statement of reasons confirmed in writing on written request.
>
> (3) A statement of reasons meets the requirements of this section only if it contains the specific reasons for the adverse action taken.

"Adverse action" is thereafter defined in § 1691(d)(6) as "a denial or revocation of credit, a change in the terms of an existing credit arrangement, or a refusal to grant credit in substantially the amount or on substantially the terms requested."

In this case, the parties do not dispute that Plaintiff fits the definition of an applicant[2] who suffered an adverse action[3] such that she was entitled to notice under § 1691(d). It is also undisputed that Car Source provided no such notice in this case—indeed, Kamil testified that Car Source never issues ECOA notices. Rather, the parties primarily dispute whether, in this instance, Car Source acted as a "creditor" under the Act and was therefore required to provide notice. And, as an ancillary matter, Plaintiff argues that the district court erred by holding that she could not obtain injunctive relief under the ECOA as a matter of law. We address these issues in turn.

## A.  Car Source is a "creditor" for the purposes of the ECOA's notice requirement

The subsection of the ECOA defining "creditor" can be divided into three clauses, which state that for the purposes of the Act, a creditor is:

[1] any person who regularly extends, renews, or continues credit;

[2] any person who regularly arranges for the extension, renewal, or continuation of credit; or

[3] any assignee of an original creditor who participates in the decision to extend, renew, or continue credit.

---

[2]Defendants' briefing argues at length that a genuine dispute exists with regard to whether Plaintiff "lied" when she signed the credit application stating that her monthly income was $1,817.38. But this dispute, assuming it exists, is relevant only insofar as it is material to Plaintiff's claim under the ECOA's notice requirement. *See* Fed. R. Civ. P. 56(a); *Anderson*, 477 U.S. at 248 (defining the facts "material" to summary judgment analysis as those "that might affect the outcome of the suit under the governing law"). To the extent Defendants argue the alleged dispute is material because lying on her credit application would disqualify Plaintiff from entitlement to notice, this argument finds no support in the text of the ECOA or its implementing regulations. *See, e.g.*, 15 U.S.C. § 1691a(b) (defining an "applicant" entitled to protection under the Act without reference to the truth of the information supporting her application for credit); 12 C.F.R. § 1002.2(e) (same); 12 C.F.R. § 1002.2(f) (defining an "application" triggering the Act's protections without reference to the truth of the information contained therein). Defendants' reliance on *Lewis v. ACB Business Services, Inc.*, 135 F.3d 389 (6th Cir. 1998), in support of their argument is likewise unavailing: that case's pronouncements concerning "frivolous or nuisance disputes" and creditors' discretion have nothing to do with the effect of an allegedly untruthful credit application on the applicability of the ECOA. *See id.* at 406. We therefore conclude that this alleged dispute is immaterial.

[3]Under Defendants' version of the facts, upon Plaintiff's return to Car Source in response to Kamil's phone call, Plaintiff was told that her three options were: (1) maintain the current terms of her existing financing agreement and be sued for "lying" on her credit application; (2) exchange the Chevrolet Cobalt for a less expensive vehicle; or (3) keep the Chevrolet Cobalt and put an additional $1,500 towards a down payment. Kamil testified that he was not willing to allow Plaintiff to maintain the terms of the existing financing agreement without any adverse consequences. Defendants do not appear to dispute that presenting Plaintiff with these options constituted an "adverse action" under the Act.

15 U.S.C. § 1691a(e).  Although the statutory language of the ECOA presents these clauses as a single, cohesive definition for "creditor," the clauses are treated differently by the regulations promulgated under the Act by the Consumer Financial Protection Bureau ("CFPB").  *See* 15 U.S.C. § 1691b(a) (granting the CFPB authority to promulgate regulations "to carry out the [ECOA's] purposes").  Those regulations are collectively known as Regulation B.  12 C.F.R. § 1002.1(a).

Importantly, Regulation B distinguishes clause [2] by stating that persons qualifying as "creditors" under that clause—that is, those who merely arrange for credit by referring applicants to lenders—are considered "creditors" solely for the purposes of the ECOA's prohibitions on discrimination and discouragement.  *See* 12 C.F.R. § 1002.2(*l*).  Under Regulation B, in other words, "creditors" who act as mere middle-men between applicants and lenders have no affirmative obligation to provide applicants with notice stating the reasons for any adverse action.  *Id.*; *see also Treadway*, 362 F.3d at 978–80.  As a result, Regulation B limits the class of creditors who *are* required to provide such notices to "person[s] who, in the ordinary course of business, regularly participate[] in a credit decision, including setting the terms of the credit;" also included are "a creditor's assignee, transferee, or subrogee who so participates."  12 C.F.R. § 1002.2(*l*); *see also* 12 C.F.R. Pt. 1002, Supp. I, cmt. 2(*l*)-2 (March 2003) (explaining that creditors "who do not participate in credit decisions" are subject only to the Act's discrimination and discouragement provisions).

Viewing the record evidence in the light most favorable to Car Source, *see Kalamazoo Acquisitions, L.L.C.*, 395 F.3d at 342, we agree with the district court that Car Source is a "creditor" subject to the ECOA's notice requirement.  There is no dispute that Car Source is, at the very least, a "person who regularly arranges for the extension, renewal, or continuation of credit," such that it qualifies as a "creditor" under the statutory definition of that term.  *See* 15 U.S.C. § 1691a(e).  The deposition testimony of Rami Kamil likewise establishes that Car Source is a "creditor" required to provide notice under Regulation B's definition of that term because Car Source "regularly participates in [the] credit decision" by "setting the terms of the credit."  12 C.F.R. § 1002.2(*l*).  Indeed, Kamil agreed that Car Source "structure[s]" customers' financing agreements by determining "how much to charge them . . . [a]nd how much interest . . .

[a]nd how big the payments are." (R. 44-2, Kamil Dep., PageID 670–71, 687) Jon Lun similarly agreed that when Car Source is preparing a financing deal that will ultimately be assigned to CAC, "the terms of the deal are totally up to" Car Source. (R. 41-10, Lun Dep., PageID 512–13.)

Defendants' primary argument on appeal is that Car Source served as a mere middle-man between Plaintiff and CAC, and that CAC was the true "creditor" with responsibility for providing Plaintiff with notice of any adverse action. We find this argument unavailing. Both Kamil and Lun testified that CAC's only role in the transaction was to determine whether it would pay Car Source an "advance" on Plaintiff's financing agreement, the terms of which were set by Car Source. The consequences of CAC's determination regarding an advance fell entirely on Car Source—under any circumstance, CAC would collect payments under the terms set by Car Source, and Plaintiff would be none the wiser. When CAC informed Car Source that no advance would be issued on Plaintiff's financing deal, it was Car Source's sole decision to react by presenting Plaintiff with an ultimatum that effectively changed the terms of her existing credit arrangement. *See* 15 U.S.C. § 1691(d)(6). When coupled with its regular participation in credit decisions, Car Source's unilateral decision to take that adverse action triggered an obligation to provide Plaintiff with a written statement of its specific reasons for doing so. *See id.* § 1691(d)(2).

Notably, this conclusion comports with the Seventh Circuit's reasoning in *Treadway*, upon which the district court in this case relied. *See* 362 F.3d at 978–81. In *Treadway*, the defendant car dealership argued that it was not a "creditor" subject to the ECOA's notice requirement because it merely declined to forward the plaintiff's credit application to any lenders after determining she was not creditworthy. *Id.* at 974. After analyzing Regulation B and its accompanying comments, the court in *Treadway* concluded, as we do above, that the regulation typically operates to exempt middle-man "creditors" from the ECOA's notice requirements. *Id.* at 979–80 (citing 12 C.F.R. Pt. 1002, Supp. I, cmt. 2(*l*)-2, and 68 Fed. Reg. 13155 (March 18, 2003)). Nevertheless, the court determined that under certain circumstances, creditors purporting to be mere middle-men may still be required to provide notice of an adverse action. *Id.* ("[T]here is a continuum of participation in a credit decision . . . . At some point along the continuum, a

party becomes a creditor for purposes of the notification requirements of the Act." (internal quotation marks omitted)). After noting several ways in which the defendant dealership regularly "participated" in credit decisions, the court emphasized that the dealership essentially denied the plaintiff's credit application—i.e., took the adverse action—by declining to refer the application to any potential lenders. *Id.* at 980–81. On those bases, the court held that the dealership was subject to the ECOA's notice requirement. *Id.* at 981.

Although the facts of this case are distinguishable from those of *Treadway*, we agree with *Treadway* insofar as it held that any "creditor"—middle-men included—that regularly participates in credit decisions and takes an adverse action with regard to a credit application bears the burden of providing notice under the ECOA. As discussed above, there is no question that Car Source fits that bill because Car Source, not CAC, makes the credit decisions and its ultimatum "change[d] . . . the terms of [Plaintiff's] existing credit arrangement." 15 U.S.C. § 1691(d)(6). Thus, regardless of whether Car Source is a middle-man creditor subject to *Treadway*'s "continuum" analysis, we would hold that Car Source is subject to the ECOA's notice requirement.

Defendants' remaining arguments are similarly unpersuasive. Defendants contend, for example, that Car Source's status as a "creditor" is somehow affected by its use of CAC's copyrighted CAPS software and template contracts when preparing Plaintiff's financing agreement. This argument finds no support in either common sense, or the statutory or regulatory definitions of "creditor." *See* 15 U.S.C. § 1691a(e); 12 C.F.R. § 1002.2(*l*). The ECOA would be a paper tiger if creditors could insulate themselves from liability simply by using a third party's copyrighted forms or software when preparing a credit application. Nor do Defendants provide any authority to support their argument that their obligation to provide notice was affected by Plaintiff's actions (e.g., allegedly abandoning her car on Car Source's lot) after Defendants took the adverse action. Finally, we note that the arguments made by Defendants for the first time in their reply brief—most of which range from legally irrelevant to potentially frivolous—are waived. *Sanborn v. Parker*, 629 F.3d 554, 579 (6th Cir. 2010) (observing that this Circuit has "consistently held . . . that arguments made to us for the first time in a reply brief are waived").

Based on the above, we conclude that the district court did not err by granting Plaintiff's motion for summary judgment on her claim under the ECOA.

**B.      Injunctive relief is available to private parties under the ECOA**

Although the district court granted Plaintiff's motion for summary judgment on her ECOA claim, the court denied Plaintiff's request for injunctive relief on that claim after concluding that such relief is not available to private parties under the ECOA.  In support of this conclusion, the court cited 12 C.F.R. § 1002.16(b)(4), which states:

> On referral, or whenever the Attorney General has reason to believe that one or more creditors have engaged in a pattern or practice in violation of the [ECOA] or this part, the Attorney General may bring a civil action for such relief as may be appropriate, including actual and punitive damages and injunctive relief.

As Plaintiff notes, however, this regulatory provision does not have the effect of limiting the availability of injunctive relief to the Attorney General.  More importantly, the statutory provision governing the types of relief available to private parties under the ECOA explicitly states that "[u]pon application by *an aggrieved applicant*, the appropriate United States district court or any other court of competent jurisdiction may grant such equitable and declaratory relief as is necessary to enforce the requirements imposed under [the Act]."  15 U.S.C. § 1691e(c) (emphasis added).  As the emphasized language suggests, the ECOA provides applicants for credit—i.e., private parties—with the right to seek equitable relief.

Although we review the denial of equitable relief under a deferential abuse of discretion standard, *Anchor v. O'Toole*, 94 F.3d 1014, 1025 (6th Cir. 1996), we have held that "[a]n abuse of discretion occurs when the district court . . . improperly applies the law." *Balsley v. LFP, Inc.*, 691 F.3d 747, 761 (6th Cir. 2012) (internal quotation marks omitted).  Because the district court denied injunctive relief based on an incorrect understanding of the controlling law, remand is necessary so that the court may exercise its discretion and evaluate the appropriateness of such relief in the first instance.

**III.      Plaintiff's conversion claims**

Plaintiff's complaint alleges that Defendants' "repossession" of her vehicle after the sale constituted conversion at common law and a violation of Michigan's statutory conversion law, Mich. Comp. Laws § 600.2919a. Under Michigan common law, conversion is defined as "any distinct act of dominion wrongfully exerted over another's personal property." *Trail Clinic, P.C. v. Bloch*, 319 N.W.2d 638, 640 (Mich. Ct. App. 1982). Michigan's statutory conversion law, on the other hand, states:

> (1) A person damaged as a result of . . . the following may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees:
>
> > (a) Another person's stealing or embezzling property or converting property to the other person's own use.
>
> . . .
>
> (2) The remedy provided by this section is in addition to any other right or remedy the person may have at law or otherwise.

Mich. Comp. Laws § 600.2919a. As recently explained by the Michigan Supreme Court in *Aroma Wines & Equipment, Inc. v. Columbian Distribution Services, Inc.*, 871 N.W.2d 136, 145–46 (Mich. 2015), § 600.2919a creates a cause of action wholly separate from the traditional tort of conversion—and although the statute comes with the added benefit of treble damages and a fee-shifting provision, it requires the plaintiff to prove that the defendant converted the property to his or her "own use." *Id.* at 146–48.

Below, the district court held that all of Plaintiff's conversion claims were barred under Michigan's "economic loss doctrine." That common-law doctrine's "basic premise is that economic losses that relate to commercial transactions are not recoverable in tort." *Quest Diagnostics, Inc. v. MCI WorldCom, Inc.*, 656 N.W.2d 858, 861 (Mich. Ct. App. 2002). The district court reasoned that because Plaintiff's claims concern conversion of a vehicle acquired via a contract of sale, she is barred under the economic loss doctrine from seeking damages "under a corresponding tort action." (R. 43, PageID 586.) Plaintiff's arguments on appeal focus exclusively on Michigan's statutory conversion law. She argues, for example, that the language of § 600.2919a(2) reflects the Michigan Legislature's express intent that a cause of action for statutory conversion should remain available "in addition to any other right or remedy the person

may have," including those that sound in contract law. She also notes that Michigan adheres to the general maxim that statutes override conflicting common law rules. *See, e.g., Pulver v. Dundee Cement Co.*, 515 N.W.2d 728, 732 n.8 (Mich. 1994) ("Obviously, if there is a conflict between the common law and a statutory provision, the common law must yield.").[4] Defendants' briefing provides no argument defending the district court's ruling on Plaintiff's conversion claims.

We ultimately agree with Plaintiff that the district court erred in applying the economic loss doctrine to bar her statutory conversion claims. However, we base our conclusion on the fact that the doctrine does not apply under the circumstances of this case.

The origins and purposes of Michigan's economic loss doctrine have been expounded upon at length. *See, e.g., Detroit Edison Co. v. NABCO, Inc.*, 35 F.3d 236, 239–41 (6th Cir. 1994); *Quest Diagnostics*, 656 N.W.2d at 861–63; *Neibarger v. Universal Coops., Inc.*, 486 N.W.2d 612, 615–18 (Mich. 1992). For our purposes, it is sufficient to note two of the doctrine's central tenets. First, the doctrine is premised on the idea that barring tort claims arising from a commercial transaction is appropriate where the risks giving rise to those claims were anticipatable and subject to the contractual bargaining process. *Quest Diagnostics*, 656 N.W.2d at 864 ("In order for the economic loss doctrine to bar recovery in tort, there must be a transaction that provides an avenue by which the parties are afforded the opportunity to negotiate to protect their respective interests."); *see also Neibarger*, 486 N.W.2d at 615 ("Contract principles . . . are generally more appropriate for determining claims for consequential damage that the parties have, or could have, addressed in their agreement."); *Llewellyn-Jones v. Metro Prop. Grp., LLC*, 22 F. Supp. 3d 760, 778 (E.D. Mich. 2014) ("The doctrine is animated by the idea that tort remedies should not bail out parties who could have anticipated losses caused by failed performance and negotiated an appropriate response.").

Thus, the doctrine is classically used to bar recovery for product liability claims arising from a purchased good's failure to live up to the buyer's expectations:

---

[4]As Tyson's counsel acknowledged at oral argument, Tyson is appealing only the statutory conversion claims, not the common law conversion claim. Tyson thus forfeits the common law conversion argument on appeal. *See United States v. Huntington Nat'l Bank*, 574 F.3d 329, 331 (6th Cir. 2009).

> Rational economic actors bargaining at arms length, in deciding both the extent of the seller's liabilities and the purchase price, should consider the possibility that the product will not perform properly . . . .  As a result, the buyer or the seller or both will then spread the cost of this contingency out, as a cost of doing business, in the form of higher prices.

*Detroit Edison Co.*, 35 F.3d at 240; *see also Metro. Alloys Corp. v. Considar Metal Mktg., Inc.*, No. 06-12667, 2007 WL 2874005, at \*5 & n.6 (E.D. Mich. Sept. 25, 2007) (collecting cases and opining that "the applicability of [Michigan's] economic loss doctrine[] appears to be limited to efforts to recover 'for economic loss caused by a defective product'" (emphasis omitted) (quoting *Neibarger*, 486 N.W.2d at 618)).  Conversely, Michigan courts have declined to apply the doctrine to bar claims for fraud in the inducement because such fraud cannot reasonably be anticipated and accounted for in the bargaining process.  *See Huron Tool & Eng'g Co. v. Precision Consulting Servs., Inc.*, 532 N.W.2d 541, 545 (Mich. Ct. App. 1995) (noting that fraud in the inducement undermines "the ability of one party to negotiate fair terms and make an informed decision").

The second relevant tenet of the doctrine is a necessary corollary to the first: tort claims are barred under the doctrine only where the duty alleged to have been violated by the defendant is implicated by the relevant contract.  *See Neibarger*, 486 N.W.2d at 615–16 (observing that the economic loss doctrine originates from the desire to reconcile overlapping duties arising from contractual relationships and tort law); *Sherman v. Sea Ray Boats, Inc.*, 649 N.W.2d 783, 788 (Mich. Ct. App. 2002) (citing *Rinaldo's Constr. Corp. v. Mich. Bell Tel. Co.*, 559 N.W.2d 647, 658 (Mich. 1997), for the proposition that Michigan's economic loss doctrine evolved out of the state's more general common law rule prohibiting recovery in tort for violation of a duty imposed by a contract).  We have explained that under Michigan law, "[n]ot all tort claims . . . are barred by the existence of a contract.  Rather, Michigan courts must inquire whether the legal duty allegedly violated by a defendant arises separately and distinctly from a defendant's contractual obligations."  *DBI Invs., LLC v. Blavin*, 617 F. App'x 374, 381 (6th Cir. 2015) (internal brackets and quotation marks omitted); *see also Hart v. Ludwig*, 79 N.W.2d 895, 898 (Mich. 1956) ("[I]f a relation exists which would give rise to a legal duty without enforcing the contract promise itself, the tort action will lie, otherwise not." (quoting W. Prosser, *Handbook of the Law of Torts*, § 33 at 205 (1st ed. 1941))).

Together, these tenets indicate that the economic loss doctrine was inappropriately applied in this case. Defendants do not dispute that execution of the RD-108 and the RIC resulted in transfer of title to the vehicle to Plaintiff and assignment of Car Source's lien on the vehicle to CAC; nor do they dispute that delivery of the vehicle to Plaintiff terminated Car Source's possessory interest. Because Defendants' contractual duties regarding title, possession, and delivery had effectively terminated by the time Plaintiff returned to Car Source on August 12, 2013, it cannot be said that her conversion claims are based on Defendants' violation of a duty arising under the contract of sale. Moreover, post-delivery repossession by a non-lien-holding seller is not the sort of risk typically anticipated by buyers in the ordinary course of bargaining for a commercial transaction. Thus, Plaintiff could not reasonably have been expected to bargain against the possibility that Defendants would repossess the vehicle without any legal authority, which is what occurred under Plaintiff's version of disputed facts.[5]

In coming to the contrary conclusion, the district court relied on the allegation in Plaintiff's complaint that Defendants' "actions in taking possession of the vehicle [were] wil[l]ful or intentional, and *in derogation of [t]he contract of sale*." (R. 32, PageID 282–283 (emphasis added).) The court held that this allegation conclusively established that "plaintiff's conversion claims are simply a restatement of the duties defendants owed her under the contract." (R. 48, PageID 766.) Notwithstanding the fact that Plaintiff's complaint clearly differentiates between her conversion claims and her claims based on Defendants' contractual duties, the district court erred by treating this conclusory allegation as a settled matter of fact for the purposes of summary judgment. *See, e.g.*, *Gooden v. Memphis Police Dep't*, 67 F. App'x 893, 895 (6th Cir. 2003) ("Conclusory allegations, speculation, and unsubstantiated assertions are not evidence . . . ."). As discussed above, the facts borne out in discovery establish that by the time Plaintiff returned to Car Source, Defendants' duties regarding possession of the vehicle

---

[5]Notably, dealerships in Car Source's position sometimes require buyers to sign so-called "spot delivery" or "conditional delivery" agreements to protect against the possibility that the buyers' applications for credit will not be approved for financing. *See, e.g.*, *Givens v. Van Devere, Inc.*, No. 5:11CV666, 2012 WL 4092738, at *1–2 (N.D. Ohio Sept. 17, 2012) (describing a "conditional delivery agreement" signed by the plaintiff car buyer which contained a provision stating: "if either I or the Dealership is unable to obtain third party financing approval or assignment of the contract/lease, . . . I and/or the Dealership may cancel the purchase/lease contract and I must immediately return the vehicle to the Dealership"). Without commenting upon the enforceability or propriety of such agreements under Michigan or federal law, we note that no such conditional delivery agreement appears in the record for this case. Thus, in any event, delivery of the vehicle to Plaintiff appears to have rendered the sale final.

no longer emanated from the contract of sale; rather, at that point in time, Defendants' duty to refrain from wrongfully exerting dominion over Plaintiff's vehicle emanated from the policies underlying the tort of conversion.

Based on the above, we conclude that the district court erred by granting Defendants' motion for summary judgment as to Plaintiff's claims for statutory conversion.

## CONCLUSION

For the reasons stated above, we **AFFIRM** the district court's grant of summary judgment in favor of Plaintiff on her ECOA claim; we **REVERSE** the district court's determination that injunctive relief was not available to Plaintiff under the ECOA, and we **REMAND** for an initial determination of whether such relief is warranted; and we **REVERSE** the district court's grant of summary judgment in favor of Defendants on Plaintiff's statutory conversion claims and **REMAND** for further proceedings on those claims.