**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

File Name: 18a0080n.06

Case No. 17-1218

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FILED**
Feb 16, 2018
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| MY IMAGINATION, LLC, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| M.Z. BERGER & CO., INC., doing business | ) | MICHIGAN |
| as MZB Ink; MZB IMAGINATION, LLC, | ) | |
| | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

BEFORE: SUHRHEINRICH, GRIFFIN, and THAPAR, Circuit Judges.

THAPAR, Circuit Judge. For students, the back-to-school season signals new beginnings. For retailers, it means major profits: American consumers spend nearly five-billion dollars on school supplies every year.[1] A new stationery company called MY Imagination wanted to enter this lucrative market. Since the company needed inventory, licenses, and retailer relationships to get the ball rolling, it decided to buy the stationery division at M.Z. Berger, a well-established consumer-goods wholesaler.

M.Z. Berger's assets were an attractive target. The company held licensing agreements with entities like Lego, Universal Studios, and pop sensation One Direction. These popular brands would likely lead to large sales with school-age kids. And M.Z. Berger agreed to help

---

[1] *See* Ana Serafin Smith, *Back-to-School and Back-to-College Spending to Reach $83.6 Billion*, Nat'l Retail Fed'n (July 13, 2017), https://nrf.com/media/press-releases/back-school-and-back-college-spending-reach-836-billion.

transfer these licenses to MY Imagination as part of the deal.  MY Imagination says that M.Z. Berger promised to exit the stationery industry too.

Things went awry shortly after the companies finalized the sale.  According to MY Imagination, M.Z. Berger failed to help transfer its licensing agreements and did not exit the stationery industry as promised.  MY Imagination sued for breach of contract, fraudulent inducement, and conversion.  The district court granted summary judgment to M.Z. Berger on all counts.  MY Imagination now appeals.  We affirm in part and reverse in part.

I.

This court reviews a district court's grant of summary judgment de novo.  *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 619 (6th Cir. 2006).  In doing so, we take the evidence in the light most favorable to the non-moving party—here, MY Imagination—and ask whether there are any genuine issues of material fact that require submission to a jury.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986); *Emp'rs Ins. of Wausau v. Petrol. Specialties, Inc.*, 69 F.3d 98, 101–02 (6th Cir. 1995); *see* Fed. R. Civ. P. 56(a).

II.

MY Imagination makes three breach-of-contract claims.  According to the agreement's choice-of-law clause, New York law governs each of them.  To succeed, MY Imagination must show that a contract existed, that it performed, that M.Z. Berger breached, and that MY Imagination suffered damages as a result.  *143 Bergen St., LLC v. Ruderman*, 42 N.Y.S.3d 252, 254 (App. Div. 2016).

The district court granted M.Z. Berger summary judgment on all of MY Imagination's contract claims after finding that MY Imagination could not prove any actual damages.  But the court's emphasis on actual damages was misplaced.  In New York, nominal damages are "always

available" for a breach of contract. *Kronos, Inc. v. AVX Corp.*, 612 N.E.2d 289, 292 (N.Y. 1993). As such, MY Imagination can proceed to trial so long as it can show a genuine dispute of fact as to the remaining three elements. *See C.K.S. Ice Cream Co. v. Frusen Gladje Franchise, Inc.*, 567 N.Y.S.2d 716, 718 (App. Div. 1991) (noting that plaintiff could survive summary judgment even if unable to show actual damages); *accord Hirsch Elec. Co. v. Cmty. Servs., Inc.*, 536 N.Y.S.2d 141, 143 (App. Div. 1988).

## A.

MY Imagination's first two contract claims relate to the transfer of M.Z. Berger's licenses. As part of the deal, M.Z. Berger agreed to (1) send letters to its licensors notifying them of the sale and (2) use other "commercially reasonable efforts" to help MY Imagination acquire its licenses. R. 42-2, Pg. ID 838–39. According to MY Imagination, M.Z. Berger fell short on both counts.

First, MY Imagination argues that M.Z. Berger sent the letters late. The contract set a deadline of June 3, 2014. Yet June 3rd came and went with no letters. So too did July and August. M.Z. Berger did not send them until September—after the district court ordered it to do so. M.Z. Berger's breach thus seems obvious: The agreement specified a deadline, and by all accounts, M.Z. Berger missed that deadline by several months.

But that is not the entire story. The agreement also required MY Imagination to "*work with* [M.Z. Berger] in good faith to prepare and send out the Licensor Letters." *Id.* at Pg. ID 840 (emphasis added). The agreement therefore imposed concurrent obligations on the parties. When an agreement imposes concurrent obligations, a party can only maintain a breach-of-contract claim for nonperformance if it was "ready and willing to perform" and has demanded performance. *Ziehen v. Smith*, 42 N.E. 1080, 1081 (N.Y. 1896) ("[W]here, by the terms of the

contract, the acts of the parties are to be concurrent, it is the duty of him who seeks to maintain an action for a breach of the contract, either by way of damages for the nonperformance, or for the recovery of money paid thereon, not only to be ready and willing to perform on his part, but he must demand performance from the other party.").

MY Imagination has not met either prong: The company did not show that it was ready and willing to work with M.Z. Berger before June 3rd, and it did not demand that M.Z. Berger send the letters until after the contractual deadline expired. In fact, MY Imagination did not send its first draft of the letter to M.Z. Berger until a full week after the deadline had passed. Nor does it suggest that it ever mentioned the letters to M.Z. Berger before then. Contract law does not reward sandbagging. M.Z. Berger is therefore entitled to summary judgment on MY Imagination's first breach-of-contract claim.

Second, MY Imagination says M.Z. Berger fell short on its more general promise to "use commercially reasonable efforts" to help transfer its licenses. R. 42-2, Pg. ID 838. Under New York law, whether a party has used reasonable efforts is almost always, as here, a question of fact. *See Kroboth v. Brent*, 625 N.Y.S.2d 748, 749–50 (App. Div. 1995); *see also Highland CDO Opportunity Master Fund, L.P. v. Citibank, N.A.*, No. 12 Civ. 2827(NRB), 2013 WL 1191895, at *11 (S.D.N.Y. Mar. 22, 2013) ("[Q]uestions of commercial reasonableness are necessarily fact intensive."); *USAirways Grp., Inc. v. British Airways PLC*, 989 F. Supp. 482, 491 (S.D.N.Y. 1997) (explaining that a fact finder can interpret an ambiguous "best efforts" requirement according to "the extrinsic circumstances concerning the parties' understanding of that term" (citation omitted)). And MY Imagination has pointed to evidence in the record that creates a genuine dispute about whether M.Z. Berger's efforts pass muster.

According to MY Imagination, M.Z. Berger did *nothing* to help transfer its licenses. M.Z. Berger only sent the licensor letters after the district court ordered it to do so. The company did not even *mention* the sale to its licensors and customers until months after signing the agreement. Moreover, Universal told MY Imagination that it would not transfer its license until M.Z. Berger told Universal that it was leaving the industry. When MY Imagination set up a conference call to clear things up, M.Z. Berger was vague about the nature of the sale. Universal never ended up transferring its license. Finally, M.Z. Berger's unpaid royalties upset licensors, which complicated M.Z. Berger's later attempts to transfer several of those licenses to MY Imagination.[2] Based on this evidence, a jury could find that M.Z. Berger's efforts were not commercially reasonable.

Although M.Z. Berger says that MY Imagination needed to provide expert testimony about what constitutes "commercially reasonable efforts" to survive summary judgment, it cites no legal authority for that proposition. This court is not in the business of developing parties' arguments, and we decline to do so here. *See Operating Eng'rs Local 324 Health Care Plan v. G & W Constr. Co.*, 783 F.3d 1045, 1057 (6th Cir. 2015) (declining to address a party's claim "[b]ecause 'it is not our function to craft an appellant's arguments'" (quoting *United States v. Phibbs*, 999 F.2d 1053, 1080 n.12 (6th Cir. 1993))). MY Imagination thus survives summary judgment on this claim.

---

[2] M.Z. Berger argues that MY Imagination's only support for its unpaid-royalties theory is inadmissible hearsay. But M.Z. Berger did not raise this hearsay objection before the district court, so it has forfeited the objection. *See Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994) ("If a party fails to object before the district court to the affidavits or evidentiary materials submitted by the other party in support of its position on summary judgment, any objections to the district court's consideration of such materials are deemed to have been waived, and we will review such objections only to avoid a gross miscarriage of justice." (citation omitted)). Even assuming that the statements were hearsay, there is no "gross miscarriage of justice," because unobjected-to hearsay is admissible. After all, attorneys often make the tactical decision not to raise a potential hearsay objection. *Cf. United States v. Williams*, 641 F.3d 758, 771 (6th Cir. 2011) (Thapar, J., concurring).

B.

In its third contract claim, MY Imagination asserts that, after selling its goodwill, M.Z. Berger solicited its former retail customers on behalf of Universal's new product line. Under New York law, a company that has sold its goodwill cannot "interfere[] with the purchaser's relationship with his newly acquired customers . . . in an effort to recapture their patronage." *Mohawk Maint. Co. v. Kessler*, 419 N.E.2d 324, 329 (N.Y. 1981). Doing so would "impair[] the very asset which [the seller] has purported to transfer." *Id.* M.Z. Berger appears to have done just that.

M.Z. Berger nevertheless maintains that the agreement allowed it to continue working with its old licensors in certain circumstances. But none of those circumstances applies here. For example, the agreement permitted M.Z. Berger to "ship goods from the Inventory *on hand* and from *finished goods*" to fulfill orders involving old licensors. R. 42-2, Pg. ID 829 (emphasis added). The Universal products M.Z. Berger tried to sell, however, had not yet been produced and thus could not have been "on hand" or "finished goods." M.Z. Berger also points to a provision that makes it "responsible for any minimum guarantee shortfall pertaining to the One Direction License Agreement and any other license or contract that is not an Assigned License." *Id.* at Pg. ID 844. This minimum-guarantee provision allows M.Z. Berger to fulfill any outstanding obligations under existing agreements. This too is inapplicable to the Universal orders at issue, which originated after the sale to MY Imagination.

Finally, M.Z. Berger contends that because Universal never transferred its license to MY Imagination, M.Z. Berger had an obligation to exploit the Universal license until it expired. M.Z. Berger suggests that it was therefore allowed to continue working with Target and Walmart on Universal's behalf. But M.Z. Berger has pointed to nothing that suggests its conflicting

contractual duty to Universal absolved it of its obligations under the agreement with MY Imagination. So M.Z. Berger is not entitled to summary judgment on this claim.

We thus affirm the district court's grant of summary judgment on MY Imagination's first breach-of-contract claim, and reverse and remand the remaining two claims.

### III.

MY Imagination also raises two tort claims against M.Z. Berger: fraudulent inducement and conversion. Though the parties discuss both Michigan and New York law in their briefs, neither explicitly argues that either state's law should apply. When neither party raises a choice-of-law issue in a diversity case, the law of the forum state—here, Michigan—applies. *See Lulaj v. Wackenhut Corp.*, 512 F.3d 760, 764 (6th Cir. 2008); *see also Sutherland v. Kennington Truck Serv., Ltd.*, 562 N.W.2d 466, 471 (Mich. 1997) (holding that forum-state law governs tort claims unless a "rational justification for displacing Michigan law exist[s]").

*Fraudulent Inducement.* MY Imagination claims that M.Z. Berger fraudulently induced it into entering the agreement when it lied about its plans to exit the stationery industry. To prevail, MY Imagination must show that M.Z. Berger made a material misrepresentation with the intent of inducing MY Imagination's reliance. *Barclae v. Zarb*, 834 N.W.2d 100, 115 (Mich. Ct. App. 2013); *see* Restatement (Second) of Contracts § 164 (Am. Law Inst. 1981). Moreover, MY Imagination must show that M.Z. Berger knew the representation was false or made it with reckless disregard for its truth, that MY Imagination actually relied on that misrepresentation, and that its reliance was justified. *Barclae*, 834 N.W.2d at 115–16, 119.

MY Imagination runs into a problem on this claim. Even if it can show that M.Z. Berger misrepresented its intentions, MY Imagination cannot show that its reliance on that misrepresentation was justifiable. The parties decided that their written agreement would

"supersede[] all prior agreements, arrangements, communications, representations and warranties, either oral or written." R. 42-2, Pg. ID 849. And when parties include a merger clause like this one, neither is justified in relying on "understandings related to performances that are not included in the written agreement." *Star Ins. Co. v. United Commercial Ins. Agency, Inc.*, 392 F. Supp. 2d 927, 929 (E.D. Mich. 2005). This includes "oral promises regarding additional or contrary contract terms." *Id.* at 930.

Had MY Imagination claimed that M.Z. Berger made representations of *fact* to induce MY Imagination into entering the contract, its fraudulent-inducement claim might succeed. *See Barclae*, 834 N.W.2d at 118. But Michigan draws a line between factual misrepresentations and "collateral agreements or understandings." *Id.* (quoting *Star Ins. Co.*, 392 F. Supp. 2d at 928–29). M.Z. Berger's alleged promise not to compete falls into the latter camp. Indeed, claims like MY Imagination's are precisely what merger clauses seek to avoid: courts effectively reading additional terms into contracts years after the fact.

There may be something to MY Imagination's claim that it never would have entered into the contract but for M.Z. Berger's promise to exit the stationery business. But MY Imagination should have accounted for that concern with a non-compete provision, not a fraudulent-inducement suit. *See UAW-GM Human Res. Ctr. v. KSL Recreation Corp.*, 579 N.W.2d 411, 420 (Mich. Ct. App. 1998) ("In light of the obvious importance of this issue to plaintiff, it is difficult to understand why an agreement regarding [this issue] was not included[.]"). Summary judgment was thus appropriate on MY Imagination's fraudulent-inducement claim.

*Conversion.* Finally, MY Imagination argues that M.Z. Berger is liable for conversion. Some background is necessary to understand this claim. When M.Z. Berger sold MY Imagination its "finished goods on hand," it promised to deliver title to those assets "free and

clear of any claims, [l]iens, encumbrances, equities or liabilities." R. 42-2, Pg. ID 826, 836, 856. Those goods included some already-printed stationery that M.Z. Berger had stored in a warehouse. After the sale, MY Imagination found a retailer to buy that stationery. M.Z. Berger refused to release it, however, because the licensor whose logos were on the stationery would not approve the sale. Instead, M.Z. Berger found its own retailer, sold the stationery, and credited the proceeds to MY Imagination.

To the extent that MY Imagination has a claim for this alleged injury, however, it does not lie in conversion. Michigan's economic-loss doctrine provides that "[w]here a purchaser's expectations in a sale are frustrated," then "his remedy is said to be in contract alone, for he has suffered only 'economic' losses." *Huron Tool & Eng'g Co. v. Precision Consulting Servs., Inc.*, 532 N.W.2d 541, 543 (Mich. Ct. App. 1995) (quoting *Kennedy v. Columbia Lumber & Mfg. Co.*, 384 S.E.2d 730, 736 (S.C. 1989)). That is what happened here. Although M.Z. Berger warranted that it had full, unencumbered title to the stationery at the time of sale, M.Z. Berger's title was in fact encumbered by an obstinate licensor. M.Z. Berger could not have sold MY Imagination more title than it had. *See* 67 Am. Jur. 2d Sales § 373; 77A C.J.S. Sales § 409. So MY Imagination's claim really sounds in contract: M.Z. Berger represented that it had full title to the stationery, but it did not. Yet MY Imagination did not sue for breach of warranty, and the economic-loss doctrine bars its conversion claim. *Cf. Tyson v. Sterling Rental, Inc.*, 836 F.3d 571, 583 (6th Cir. 2016) (holding that the economic-loss doctrine did not bar conversion claim where "[d]efendants' contractual duties regarding title, possession, and delivery had effectively terminated," meaning that plaintiff's claim "no longer emanated from the contract of sale").

IV.

We **AFFIRM** in part, **REVERSE** in part, and **REMAND** for further proceedings consistent with this opinion.