**NOT RECOMMENDED FOR PUBLICATION**
**File Name: 19a0124n.06**
**No. 18-3339**

| | | |
|---|---|---|
| **UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT** | | **FILED**<br>Mar 15, 2019<br>DEBORAH S. HUNT, Clerk |

JOHN DOE,                                          )
                                                   )
    Plaintiff-Appellant,                       )
                                                   )
v.                                                 )        ON APPEAL FROM THE
                                                   )        UNITED STATES DISTRICT
UNIVERSITY OF DAYTON; JANE ROE;                    )        COURT FOR THE
NATIONAL CENTER FOR HIGHER                         )        SOUTHERN DISTRICT OF
EDUCATION RISK MANAGEMENT; and                     )        OHIO
DANIEL C. SWINTON,                                 )
                                                   )                OPINION
    Defendants-Appellees.                      )

BEFORE:    KEITH, STRANCH, and DONALD, Circuit Judges.

**JANE B. STRANCH, Circuit Judge.** Plaintiff John Doe alleges that he was wrongfully suspended from the University of Dayton after Defendant Jane Roe accused him of sexual assault. He filed Title IX, breach of contract, and tort claims against the University, Roe, and the investigator the University hired. The district court dismissed all claims. For the reasons explained below, we **AFFIRM**.

## I. BACKGROUND

On September 4, 2016, Doe and Roe had a sexual encounter. That night, Roe reported to University police that she had been sexually assaulted.

The University's Sexual Harassment Code of Conduct strictly prohibits all forms of sexual harassment, defined to include sexual assault and any other sexual conduct without "effective consent." According to the Student Handbook, "[e]ffective consent is granted when a person

freely, actively and knowingly agrees at the time to participate in a particular sexual act with a particular person." Standard punishments for a violation "range from educational interventions to expulsion."

Just over a week after the incident, the University sent Doe a Notice of Investigation, attaching a copy of Roe's complaint and explaining the process and Doe's rights, as laid out in the Student Handbook. The notice stated that the matter had been referred to an external investigator, Defendant Daniel Swinton, an employee of Defendant National Center for Higher Education Risk Management (NCHERM). According to the Handbook, Swinton's role was to compile an investigatory report and determine whether, when "all of the evidence is viewed in a light most favorable to [the complainant,] . . . there is probable cause to believe that the respondent might have violated" University policy.

Swinton interviewed Doe, Roe, seven other Dayton students, and one of the University officers who responded to Roe's initial call. He then drafted a report containing interview notes, written statements from Doe and Roe, police incident reports, text messages between Doe and Roe, pictures of the locations, and the results of a polygraph exam provided by Doe. Based on that evidence, Swinton first determined that there was no probable cause to believe Doe used force to obtain consent or that Roe was incapacitated and so unable to consent. He then performed a consent analysis and concluded that, "when viewing the facts in a light most favorable to the complainant, . . . probable cause exists to believe that 1) non-consensual sexual intercourse, 2) non-consensual sexual contact, and 3) sexual harassment may have occurred in violation of University of Dayton policies."

The matter was then referred for a hearing before the University Hearing Board. The Board reviewed Swinton's report and heard testimony from Roe, Doe, and other witnesses. Based on that evidence, the Board concluded that Doe had violated the Code of Conduct by committing sexual harassment, reasoning as follows:

> The University Hearing Board voted that they believed it was more likely than not that [Roe's] version of events in the bedroom occurred specific to non-consensual sexual intercourse. They referenced the agreement of both parties that the complainant indicated she did not think she wanted to do this and indicated that they believed by preponderance of the evidence that [Roe's] version of when and how many times it was said more likely than not occurred.

> With regards to non-consensual sexual contact, the board determined that the kissing was consistently described by both parties and was inconsequential compared to the non-consensual sexual intercourse. The board made a finding of not responsible on this matter given they fell at 50/50 on the scale of preponderance.

(R. 23-37, Hr'g Bd. Notice of Action, PageID 1516) Doe was suspended for a year and a half, until the end of the following school year.

Doe appealed the decision to the University's Judicial Review Committee. The Committee identified one error that had occurred at the hearing: neither Doe nor Roe had been given the opportunity to submit to the Board questions relating to live testimony given at the hearing. The Student Handbook provides that "[d]uring the course of the hearing, the board will allow both parties to submit questions they would like to have asked of the other or to key witnesses." Parties are to be given 10 to 15 minutes to prepare "questions addressing information that occurred during the hearing," and then the "[t]he board determines the questions they will ask by considering the relevance of the content to their purpose, their need for the information in order to make a decision and the appropriateness of the question." To remedy the error, the Committee gave both Doe and Roe the opportunity to listen to a recording of the hearing, after which they had an hour to draft questions for the Board to pose to the witnesses. Doe did so, providing two and a half pages of

questions. The Board reconvened the following day. According to a letter the Associate Dean of Students sent to Doe, they "carefully reviewed all questions submitted and determined that none of those questions would provide additional information that could alter the determinations already made with regards to a code violation of sexual harassment." That determination was in turn presented to the Judicial Review Committee, which "indicated that the original decision by the University Hearing Board in this case stands." The previously imposed suspension became effective that day.

Doe then filed the instant suit, bringing claims against the University, Roe, NCHERM, and Swinton for violation of Title IX, breach of contract, promissory estoppel, negligence, defamation, intentional infliction of emotional distress, and declaratory judgment. He alleges that the sexual encounter was consensual and that Roe fabricated the assault claim "to avoid discipline related to her work." As an employee of Dayton's athletic department, Roe was not permitted to engage in sexual conduct with Doe, a student athlete. Doe also argues that the campus environment was hostile to men and that the investigatory and Board proceedings were biased and procedurally deficient. He avers that as a result, he suffers from post-traumatic stress disorder, anxiety, and depression; was denied admission to another university; and lost an opportunity to be recruited by a coach at another school. The district court dismissed all claims. Doe appeals as to all claims and all Defendants.

## II. ANALYSIS

We review a district court order granting a motion to dismiss de novo. *See Hill v. Snyder*, 878 F.3d 193, 203 (6th Cir. 2017). In doing so, we construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550

U.S. 544, 570 (2007)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*  Our review of factual allegations encompasses exhibits attached to the complaint, which may be considered without converting the "motion to dismiss into one for summary judgment."  *Matthew N. Fulton, D.D.S., P.C. v. Enclarity, Inc.*, 907 F.3d 948, 953 (6th Cir. 2018).

As a preliminary matter, we note that Doe concedes that Dayton, a private university, is not a state actor.  Dayton is therefore not subject to suit under 42 U.S.C. § 1983, *see Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295, 305 (2001), and whether the procedures employed in Doe's hearing would constitute due process of law is not before us.  We ask only whether Defendants' behavior violated Title IX, breached applicable contracts, or gave rise to tort liability.

### A.      Title IX Claims

Title IX provides that, subject to certain exceptions not relevant here, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  "Title IX is enforceable through a judicially implied private right of action, through which monetary damages are available."  *Doe v. Miami Univ.*, 882 F.3d 579, 589 (6th Cir. 2018) (quoting *Klemencic v. Ohio State Univ.*, 263 F.3d 504, 510 (6th Cir. 2001)).

We have recognized at least four theories of Title IX liability in cases alleging gender bias in university disciplinary proceedings:   (1) erroneous outcome, (2) selective enforcement, (3) deliberate indifference, and (4) archaic assumptions.  *Id.*  We have also recognized the viability of a fifth theory, hostile environment, in other contexts, though not in the context of a suit related

to disciplinary proceedings. *Id.* (citing *Doe v. Claiborne County*, 103 F.3d 495, 515 (6th Cir. 1996)). Doe pursues four of these five theories—all but archaic assumptions.

#### 1. Erroneous Outcome

To present a viable claim under the erroneous outcome theory, a plaintiff must allege "facts sufficient to (1) 'cast some articulable doubt' on the accuracy of the disciplinary proceeding's outcome, and (2) demonstrate a 'particularized causal connection between the flawed outcome and gender bias.'" *Doe v. Baum*, 903 F.3d 575, 585 (6th Cir. 2018) (ellipsis omitted) (quoting *Miami Univ.*, 882 F.3d at 592). Because Doe's core argument is that he was subject to unfair procedures that were biased against men, this is the Title IX theory that most naturally fits his allegations.

We assume for purposes of argument that Doe has satisfied the first requirement and proceed immediately to the second prong. To allege a particularized causal connection, we have generally required plaintiffs to point to some hint of gender bias in their own disciplinary proceedings. Thus, for example, it is not enough to allege that in all of one university's sexual assault investigations during the relevant period, "the accused was male and was ultimately found responsible." *Doe v. Cummins*, 662 F. App'x 437, 453 (6th Cir. 2016). This prong is satisfied, however, when that same claim is combined with other troubling allegations, including both an affidavit that "describes a pattern of the University pursuing investigations concerning male students, but not female students" and a showing that in the plaintiff's own case, the university "initiated an investigation into him but not" his female accuser. *Miami Univ.*, 882 F.3d at 593. (In that case, there was an allegation that the accuser herself violated the University's policies by kissing the plaintiff when he was "inebriated to the extent that he could not consent." *Id.* at 591.) Similarly, alleging that a university adopted certain procedures due to pressure from the federal government is not enough on its own, *see Cummins*, 662 F. App'x at 452–53, but suffices when combined with an allegation that the plaintiff's hearing body disagreed with the findings of the

initial investigator based on "exclusively female testimony," even though the reason given for discrediting the men (membership in the accused's fraternity) applied equally to the women (all members of the accuser's sorority), *Baum*, 903 F.3d at 586.

In this case, Doe contends that three of his allegations, when considered in their entirety, demonstrate a comparable causal connection to gender bias.[1] First, in 2014, Dayton entered into a resolution agreement with the Department of Education's Office of Civil Rights, agreeing to modify its policies for handling complaints. Doe alleges that his discipline was motivated in part by a desire to avoid further federal scrutiny and negative publicity. The helpfulness of this 2014 agreement to Doe's case is questionable. According to the news article Doe attached to his complaint describing the resolution agreement, "none of the Title IX complaints [spurring the resolution agreement] involved sexual assault." The policy changes mandated by the resolution agreement—about the role of the Title IX coordinator, the use of informal resolution processes, the right to counsel, and the conduct of a hearing when the complainant and respondent cannot be in the same room—are not the same policies that Doe alleges were indicative of gender bias in his hearing. But even if we assume the agreement is both relevant and indicative of bias, Doe fails to draw any connection between that agreement and his hearing two years later. He does not allege, for example, that the University or the individuals involved in his hearing were facing substantial public pressure or outcry in the weeks leading up to his hearing—facts the Second Circuit found persuasive in *Doe v. Columbia University*, 831 F.3d 46, 57–58 (2d Cir. 2016). The 2014 agreement therefore does not provide the necessary "particularized" evidence of a causal connection between gender bias and the outcome of Doe's hearing. *See Cummins*, 662 F. App'x at 452–53.

---

[1] In Doe's opening brief, he raised a fourth allegation, related to statistics cited by another Board member in her doctoral thesis. In his reply brief, he acknowledges that the individual mentioned did not serve on Doe's Hearing Board and so withdraws the argument.

Next, Doe argues that one member of the Hearing Board revealed gender bias by supporting the film *The Hunting Ground*, which Doe alleges portrays campus sexual assault inaccurately. Just over a year before Doe's hearing, the Board member posted on Facebook that the film was a "[m]ust see," indicated it was unacceptable for a fraternity to be known as the "roofie frat," and agreed with a response implying that men should masturbate instead of "hav[ing] sex with unconscious women." A single comment made at a substantial temporal remove from Doe's hearing is of limited value in discerning discrimination—especially when, as here, the discriminatory aspect of the statement is difficult or impossible to discern. It is not problematic for a Board member to express distaste for sex with unconscious partners or for using drugs to obtain consent—both clear violations of Dayton's "effective consent" policy. And while Doe has alleged that the film is based on inaccurate statistics and discredited accounts, those flaws do not plausibly suggest gender bias in a supporter of the film who was not necessarily aware of the criticisms.

Finally, Doe highlights his allegations that, "[u]pon information and belief, in virtually all cases of campus sexual misconduct by Dayton [sic], the accused student is male and the accusing student is female," and "[u]pon information and belief, Dayton possesses additional documentation evidencing their refusal to discipline female students who were alleged to have sexually assaulted male students." As previously explained, the fact that sexual assault proceedings have been brought only against male students is not in and of itself sufficient to infer gender bias. *Cummins*, 662 F. App'x at 453–54. And, more fundamentally, these generalized, conclusory statements, devoid of underlying factual support, do not suffice to allege a *particularized* causal connection between gender bias and Doe's suspension. *See Baum*, 903 F.3d at 585.

In sum, Doe references events that are temporally removed from his hearing and raise little or no inference of discrimination; he then augments those allegations with speculation about evidence he might uncover later in the proceedings. Even considering all Doe's allegations in combination, they do not show that gender bias had some causal connection to the outcome of his disciplinary hearing. The erroneous outcome theory fails.

### 2. Hostile Environment

We next consider whether Doe has made out a Title IX claim under the hostile environment theory. Such a claim "is analogous to a Title VII hostile-environment claim." *Miami Univ.*, 882 F.3d at 590. To succeed, Doe must allege "that his educational experience was 'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive so as to alter the conditions of [his]' educational environment." *Id.* (brackets omitted) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

Doe points to a series of film screenings and on-campus events that he argues amounted to a "campaign of intimidation and insult which altered the educational environment of males like Doe by portraying them as sexual deviants." We are dubious that programming highlighting sexual violence, even when focused on sexual violence committed by men, could create a hostile environment absent unusual circumstances. After all, though Doe vigorously disputes how often sexual violence on college campuses occurs, he concedes that some women are sexually assaulted on college campuses. One instance of sexual assault is too many, and it is logical and appropriate for universities to host events confronting an acknowledged problem. Indeed, such actions appear to be mandated by federal regulation. *See* 34 C.F.R. § 668.46(j) (requiring each covered university to "include in its annual security report a statement of policy that addresses the institution's programs to prevent dating violence, domestic violence, sexual assault, and stalking").

The aspects of the events that Doe takes issue with do not rise to the level necessary for a hostile environment claim. Making available or distributing allegedly inaccurate information does not equate to intimidation or insult. Using male pronouns when highlighting problematic statements such as "he said if I really loved him, I would have sex with him," is not equivalent to accusing all male students of committing or condoning sexual assault. Nor does highlighting sexual assault of women by men negate the possibilities that women can commit sexual assault or that men can be sexually assaulted. Indeed, the first line of the description of sexual harassment in Dayton's Handbook states that the offense "[c]an be committed by a man or woman against a person of the same or opposite sex." Doe therefore does not plausibly allege that the events hosted at Dayton crossed the line into "intimidation, ridicule, and insult." *Miami Univ.*, 882 F.3d at 590 (quoting *Harris*, 510 U.S. at 21).

Moreover, Doe fails to allege that he was even aware that these events took place while he was a student at Dayton, much less that they meaningfully changed the conditions of his educational environment. We hesitate to deem an environment hostile to a plaintiff when "there is no evidence that plaintiff was aware" of what occurred. *Abeita v. TransAmerica Mailings*, 159 F.3d 246, 249 n.4 (6th Cir. 1998). Though Doe was not required to allege that he personally attended the events or even that he knew about them at the time they occurred, *see Jackson v. Quanex Corp.*, 191 F.3d 647, 661 (6th Cir. 1999), he had to connect those events to his personal educational environment. The conclusory allegation that these events "interfere[] with males' ability to participate in or benefit from various activities including learning on campus" is insufficient.

Doe also appears to argue that his hearing and ultimate suspension interfered with his ability to participate in campus life. But we have already explained that "allegations of gender

bias in the University's sexual-assault disciplinary process" do not constitute the sort of intimidation, ridicule, or insult that can sustain a hostile environment claim. *Miami Univ.*, 882 F.3d at 590. Doe's criticisms of that process have already been analyzed in their proper place, under the erroneous outcome rubric.

### 3. Deliberate Indifference

Doe next advances the deliberate indifference theory. Here, he must allege that the school "acts with deliberate indifference to known acts of harassment in its programs or activities" and that the harassment "is so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 633 (1999). "[W]e have held that to plead a Title IX deliberate-indifference claim, 'the misconduct alleged must be sexual harassment,' not just a biased disciplinary process." *Baum*, 903 F.3d at 588 (quoting *Miami Univ.*, 882 F.3d at 591). Thus, to the extent this claim is premised on procedural flaws in the proceedings themselves, it fails.

Doe argues that his deliberate indifference claim is also based on the programming about sexual violence that formed the basis for his hostile environment claim. He does not, however, allege that the University "had actual knowledge" about any sexual harassment that occurred at those events. *Tumminello v. Father Ryan High Sch., Inc.*, 678 F. App'x 281, 284 (6th Cir. 2017). And, for the same reasons described above in the hostile environment context, permitting campus events discussing sexual assault—even with some inaccuracies—is not "severe, pervasive, and objectively offensive" harassment. *Davis*, 526 U.S. at 633.

### 4. Selective Enforcement

Doe's final Title IX theory is selective enforcement. "To prevail on a 'selective enforcement' claim, the plaintiff must show that a similarly-situated member of the opposite sex was treated more favorably than the plaintiff due to his or her gender." *Cummins*, 662 F. App'x

at 452. Doe has not identified any woman accused of sexual assault at Dayton University who was not referred to disciplinary proceedings. Instead, he returns to his allegation that, "[u]pon information and belief, Dayton possesses additional documentation evidencing their refusal to discipline female students who were alleged to have sexually assaulted male students." Doe provides no factual content to underpin this allegation. The bare allegation, unsupported by facts, does not suffice to state a claim. *See 16630 Southfield L.P. v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 506 (6th Cir. 2013) ("[T]he plaintiffs have not identified any similarly situated individuals whom [the defendant] treated better. They have merely alleged their 'belief' that such people exist. These 'naked assertions devoid of further factual enhancement' contribute nothing to the sufficiency of the complaint." (quoting *Iqbal*, 556 U.S. at 678)).

In sum, Doe has not stated a claim for a violation of Title IX under any of these four theories. The district court properly dismissed Doe's Title IX claims.

### B. Contract Claims

Doe next alleges that Dayton, Swinton, and NCHERM breached applicable contracts and the implied covenant of good faith and fair dealing. The parties do not dispute that these state law claims are analyzed under Ohio law.

### 1. Breach of Contract Against Dayton

"A cause of action for breach of contract requires the claimant to establish the existence of a contract, the failure without legal excuse of the other party to perform when performance is due, and damages or loss resulting from the breach." *Lucarell v. Nationwide Mut. Ins. Co.*, 97 N.E.3d 458, 469 (Ohio 2018). The parties agree that the relationship between Doe and Dayton is contractual and that the Student Handbook lays out the contract terms. *See Behrend v. State*, 379 N.E.2d 617, 620 (Ohio Ct. App. 1977) ("[W]hen a student enrolls in a college or university, pays his or her tuition and fees, and attends such school, the resulting relationship may reasonably be

construed as being contractual in nature."). We therefore ask whether Dayton failed to perform on the contract.

Our review of Dayton's actions is limited, recognizing that "contracts for private education have unique qualities and must be construed to allow the institution's governing body to meet its educational and doctrinal responsibilities." *Valente v. Univ. of Dayton*, 438 F. App'x 381, 384 (6th Cir. 2011) (brackets omitted) (quoting *Ray v. Wilmington Coll.*, 667 N.E.2d 39, 42 (Ohio Ct. App. 1995)). We "will not interfere in these matters in the absence of a clear abuse of discretion." *Schoppelrei v. Franklin Univ.*, 228 N.E.2d 334, 336 (Ohio Ct. App. 1967). "In confronting challenges to private school disciplinary proceedings, the appropriate question is thus 'whether the proceedings fell within the range of reasonable expectations of one reading the relevant rules, an objective reasonableness standard.'" *Faparusi v. Case W. Reserve Univ.*, 711 F. App'x 269, 277 (6th Cir. 2017) (quoting *Pierre v. Univ. of Dayton*, 143 F. Supp. 3d 703, 713 (S.D. Ohio 2015)).

Doe's broad argument is that his proceedings were unfair and so the University breached general Handbook guarantees such as "ensur[ing] that respondents . . . are treated fairly in the University's processes." In light of the governing objective standard, we may not accept as sufficient Doe's subjective claim of an unfair proceeding that reached the wrong conclusion. Nor may we derive an ideal of fairness by analogy to the procedural protections applicable in courts of law. *See Doe v. Univ. of Cincinnati*, 872 F.3d 393, 400 (6th Cir. 2017) ("[The University] is not required to 'transform its classrooms into courtrooms' in pursuit of a more reliable disciplinary outcome." (quoting *Jaksa v. Regents of Univ. of Mich.*, 597 F. Supp. 1245, 1250 (E.D. Mich. 1984))). Rather, because our inquiry asks "whether the proceedings fell within the range of reasonable expectations of one reading the relevant rules," *Faparusi*, 711 F. App'x at 277 (citation

omitted), we consider each instance of allegedly unfair conduct by the University and compare it to the governing Handbook provisions.

Doe first raises two allegations centering on the Board's failure to ask witnesses questions that he proposed. Before his hearing, Doe submitted a list of questions to be asked of each witness. He alleges that the Board asked none of them, thereby breaching the Handbook's promise that "[q]uestions deemed relevant and appropriate by the [Board] will be addressed to the individual [witness] by the [Board] chair." He similarly faults the Board's decision after the Judiciary Review Committee gave him an opportunity to review the taped proceedings and propose another set of questions. At that point, the Board declined to reconvene the witnesses and pose the proposed questions because "none of those questions would provide additional information that could alter the determinations already made with regards to a code violation of sexual harassment." Doe argues this was also error because the Board failed to apply the Handbook's "relevant and appropriate" standard.

The Handbook is divided into sections that lay out expectations for particular topics and types of proceedings. The section describing Board procedures in sexual harassment cases states that "the University Hearing Board process and procedure differs for cases that do not involve sexual harassment and harassment" and provides a cross reference to another section that lays out "the process for other Codes of Conduct." The "relevant and appropriate" provision Doe cites is found in the cross-referenced section governing other conduct violations, not in the harassment-specific procedures. The harassment procedures do not mention the "relevant and appropriate" standard. Instead, in harassment cases, "[t]he board determines the questions they will ask by considering the relevance of the content to their purpose, their need for the information in order to make a decision and the appropriateness of the question." The Board's "approval process is closed

to both parties," and the Board "is not required to provide rationale for the acceptance or denial of any question." The Handbook therefore did not oblige the Board to ask the questions Doe proposed before the hearing or to explain to Doe why his questions were not asked, and the Board properly considered its "need for the information in order to make a decision" when it rejected proposed questions that would not "alter the determinations already made."

Next Doe states that Dayton imposed "arbitrary and capricious time limitations on Doe that were not contained in Dayton's policies." He appears to reference the requirement imposed after the Judiciary Review Committee's remand that he view the taped proceeding between January 12 and 17 and submit questions within one hour of the viewing. The one-hour limit was more generous than the Handbook, which allows parties only 10 to 15 minutes to generate questions from live testimony. As to the selection of dates, the Handbook is silent about how to navigate the unusual circumstance mandated by the Committee's remand. The University may therefore have been obliged to pick a date in good faith. *See Shimrak v. Goodsir*, 2014-Ohio-3716, ¶ 25 (Ohio Ct. App. Aug. 28, 2014) ("[I]f a contract is silent on a point, '[t]he parties to a contract are required to use good faith to fill the gap.'" (quoting *Burlington Res. Oil & Gas Co. v. Cox*, 729 N.E.2d 398, 401 (Ohio Ct. App. 1999))). *But see Lucarell*, 97 N.E.3d at 469 ("[T]here is no violation of the implied duty [of good faith] unless there is a breach of a specific obligation imposed by the contract . . . ."). The University gave Doe three business days to review the hearing and indicated that it would "allow for an extension if there was good reason." Doe does not allege that he provided such a reason and was ignored, so even assuming the University was obliged to act in good faith, we see no basis to conclude that it failed to do so.

Doe also argues that the University breached Handbook provisions by not allowing him to submit exhibits, call a witness, or access a medical record that Roe referenced during her live testimony. These arguments turn in part on the Board's process for receiving evidence. Participants are not "permitted to submit information to the Student Conduct System outside of the investigation." Doe concedes that he suggested witnesses and provided evidence to Swinton during the investigation. Pursuant to the Handbook, then, he could call a new witness or introduce new evidence only under "extraordinary circumstances," and "[t]he University reserves the right to determine what is considered an extraordinary circumstance." Doe does not allege that the University deemed his circumstances extraordinary, nor (assuming such a challenge would be permissible) does he explain why the University should have made such a determination. Barring him from submitting further exhibits or calling new witnesses thus comported with the Handbook. To the extent Doe wished to call a witness who had already testified to the investigator, the Board was bound by the Handbook provision that "witnesses are not compelled to participate in the University Hearing Board process."

The argument about Roe's medical record fails for a similar reason. Because that record was not included in the investigatory report, it could not be provided to the Board—and so to Doe—at the hearing. Doe points to no Handbook provisions requiring production of documents that are referenced during the hearing but were not included in the report, and the University was not required to have such a process in place. *See Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 635 (6th Cir. 2005) (noting "unanimous" agreement that "neither rules of evidence nor rules of civil or criminal procedure need be applied" at disciplinary hearings).

In sum, having compared the language of the Handbook to the procedures described in the complaint, we see no "clear abuse of discretion," *Schoppelrei*, 228 N.E.2d at 336, in the University's interpretation and implementation of its hearing procedures.

### 2.  Breach of Contract Against Swinton and NCHERM

We next consider Doe's breach of contract claims against Swinton and NCHERM arising from the investigation.  Doe alleges that, because Dayton hired NCHERM and its employee Swinton to perform the Title IX investigation, there must have been a contract between them, the contract must have incorporated the terms of the Handbook and applicable federal law, and Doe must have been an intended third-party beneficiary of the contract.

We hesitate to accept the proposition that a plaintiff may plead upon information and belief not only that a contract exists but also what its terms would be and that it would confer upon him the rights of a third-party beneficiary.  But even if such pleading is permissible, Doe must allege some action by NCHERM or Swinton that breached the alleged contract terms.  The one action Doe identified in his opening brief is Swinton's treatment of Doe's proposed polygraph evidence.  The portion of Swinton's report discussing the polygraph states:

> Before briefly reviewing the results of the polygraph examination, it may be helpful to provide some context as to its reliability and efficacy.  Polygraph examinations typically consist[] of a series of control questions (in this case, seven) to establish a baseline, with a smaller number of key questions (in this case, three) pertinent to the issue posed for comparison.  The American Psychological Association encourages people to view them skeptically.  Additionally, most courts do not allow their use in proceedings given their lack of reliability and efficacy.  Polygraph examinations often are only able to test whether a person *believes* they are telling the truth, not whether they are actually telling the truth.  As such, using polygraphs for probative purposes is problematic.
>
> [Doe] privately arranged for a polygraph examination and presented the results to the investigators.  The examiner asked three issue-specific questions, which the examiner opines were answered by [Doe] in a manner "indicative of truthfulness":

> *Q: Did [Roe] take off her own pants for sex[?]*
> *A: Yes*
> *Q: Did you [in] any way force [Roe] to have sex of any kind?*
> *A: No*
> *Q: Did [Roe] in any way object to engaging in sex act[s] with you?*
> *A: No*

> [Doe] seems to have selected a well-respected professional to perform the polygraph exam and it seems to have been performed in accordance with professional standards. The exam is a piece of evidence that could, at the discretion of the decision-maker, serve to assist with [Doe]'s credibility, but the exam should not be viewed as proof of [Doe]'s truthfulness or of the veracity of [Doe]'s statements.

(R. 23-34, Investigation Report, PageID 1442–43) Swinton's duty under the Handbook was to "compile all of the evidence." He presented Doe's polygraph evidence to the Board in a manner that described both its potential usefulness and its limitations—and, in so doing, was more generous to Doe than a federal court would have been. *See United States v. Sherlin*, 67 F.3d 1208, 1216 (6th Cir. 1995) ("[U]nilaterally obtained polygraph evidence is almost never admissible under Evidence Rule 403." (quoting *Conti v. Comm'r*, 39 F.3d 658, 663 (6th Cir. 1994))). Doe has not alleged that Swinton made any factual errors in his presentation of the polygraph evidence. To the extent Doe takes issue with Swinton's conclusion that the polygraph was not conclusive, Swinton was required to view the evidence "in a light most favorable to [Roe]." He did not breach a contractual obligation to Doe by doing so.

In Doe's reply brief, he raises a new argument about the omission of facts favorable to Doe from Swinton's report. Doe has likely forfeited this argument by failing to raise it in his opening brief and then referencing it only briefly on reply. *See Tyson v. Sterling Rental, Inc.*, 836 F.3d 571, 580 (6th Cir. 2016). But even if the argument is properly before us, it suffers from the same infirmity as the polygraph argument. Swinton included the facts favorable to Doe—about Roe's intoxication and flirtatiousness, the timeline, and Doe's lack of familiarity with Roe's apartment—in his report. Swinton was not required to draw Doe's preferred conclusions from that evidence;

to the contrary, as already explained, he was required to view the evidence in the light most favorable to Roe.

We therefore find no basis to conclude that Swinton or his employer committed a breach of contract.

### 3. Breach of Covenant of Good Faith and Fair Dealing

Doe next claims that Dayton, NCHERM, and Swinton breached the implied covenant of good faith and fair dealing. This claim invokes the rule, recognized in Ohio law, that "[i]n addition to a contract's express terms, every contract imposes an implied duty of good faith and fair dealing in its performance and enforcement." *Lucarell*, 97 N.E.3d at 469. But as the Ohio Supreme Court held just last year, "there is no independent cause of action for breach of the implied duty of good faith and fair dealing apart from a breach of the underlying contract." *Id.*; *see also Ne. Ohio Coll. of Massotheraphy v. Burek*, 759 N.E.2d 869, 875 (Ohio Ct. App. 2001) (same). Because the Defendants did not breach contract terms or otherwise act in bad faith, there is no independent basis to maintain this cause of action for breach of the implied covenant.

In sum, the University, Swinton, and NCHERM adhered to the procedures laid out in the Handbook. Doe argues that those procedures are themselves flawed, but his dissatisfaction does not give rise to a claim for breach of contract. The district court properly dismissed all Doe's contract claims.

### C. Tort Claims

We turn next to Doe's tort claims. As with the claims for breach of contract, these claims are creatures of state law analyzed pursuant to the decisions of Ohio courts.

#### 1. Promissory Estoppel and Negligence

Doe argues the district court should not have dismissed his promissory estoppel and negligence claims against Dayton, NCHERM, and Swinton.

Though these two claims have distinct elements, Doe's allegations as to each suffer from the same flaw. The first element of a promissory estoppel claim is a "clear and unambiguous" promise. *Cohen & Co. v. Messina*, 492 N.E.2d 867, 872 (Ohio Ct. App. 1985). The first element of a negligence claim is "the existence of a duty." *Armstrong v. Best Buy Co.*, 788 N.E.2d 1088, 1090 (Ohio 2003). In this case, the promises made and duties owed are found in the terms of the Handbook and in Title IX itself.

Claimed violations of Handbook terms have already been analyzed in their proper place, as potential breaches of contract. *See O'Neill v. Kemper Ins. Cos.*, 497 F.3d 578, 583 (6th Cir. 2007) ("In Ohio, 'where the parties have an enforceable contract and merely dispute its terms, scope, or effect, one party cannot recover for promissory estoppel.'" (alterations omitted) (quoting *Terry Barr Sales Agency, Inc. v. All-Lock Co.*, 96 F.3d 174, 181 (6th Cir. 1996))); *Bowman v. Goldsmith Bros. Co.*, 109 N.E.2d 556, 557 (Ohio Ct. App. 1952) ("[A]n action of tort for negligence cannot be maintained unless the defendant's conduct constituted the breach of a duty imposed by law, apart from it being a breach of an obligation created by agreement of the parties, either express or implied."). There is no dispute that the Handbook is a contract, so Doe's response that these claims are pled in the alternative to his contract claims does not rescue them.

Claimed violations of Title IX have likewise been analyzed in their proper place, under recognized Title IX rubrics—not as freestanding tort claims. *See Horner ex rel. Horner v. Ky. High Sch. Athletic Ass'n*, 206 F.3d 685, 691 (6th Cir. 2000) ("The Supreme Court rejected the use of agency or negligence principles to render the school district liable for monetary damages under Title IX." (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 285 (1998))); *see also Stiles*

*v. Grainger County*, 819 F.3d 834, 849 (6th Cir. 2016) ("Title IX authorizes suit only against the school itself and not individual administrators . . . .").

The promissory estoppel and negligence claims were therefore properly dismissed.

### 2.    Defamation

Doe also brings defamation claims against Roe.[2]   Under Ohio law, a plaintiff alleging defamation must show:  "(1) that a false statement of fact was made, (2) that the statement was defamatory, (3) that the statement was published, (4) that the plaintiff suffered injury as a proximate result of the publication, and (5) that the defendant acted with the requisite degree of fault in publishing the statement." *Am. Chem. Soc'y v. Leadscope, Inc.*, 978 N.E.2d 832, 852 (Ohio 2012).  Absolute and qualified privilege are recognized defenses to defamation, *see M.J. DiCorpo, Inc. v. Sweeney*, 634 N.E.2d 203, 209 (Ohio 1994), and truth is an absolute defense, *see McPeek v. Leetonia Italian-Am. Club*, 882 N.E.2d 450, 454–55 (Ohio Ct. App. 2007).

Doe does not dispute that Roe's statements made in preparation for and during the disciplinary hearing are entitled to absolute immunity.  *See Savoy v. Univ. of Akron*, 15 N.E.3d 430, 435–36 & n.3 (Ohio Ct. App. 2014) (affording absolute privilege to statements made in the context of university disciplinary proceedings).  Instead, he focuses on Roe's alleged statements to six friends and roommates that Doe sexually assaulted her.  Private statements to friends are not the type of utterances commonly thought of as giving rise to defamation claims.  *See, e.g.*, *Hustler Magazine v. Falwell*, 485 U.S. 46, 47 (1988) (parody in a national magazine); *Garrison v. Louisiana*, 379 U.S. 64, 65 (1964) (statement at a press conference); *N.Y. Times Co. v. Sullivan*,

---

[2] The district court stated in a footnote, citing *Caci v. Laborers International Union*, No. 97-CV-0033A, 2000 WL 424199, at *1–2 (W.D.N.Y. Mar. 31, 2000), *aff'd sub nom. Panczykowski v. Laborers' Int'l Union*, 2 F. App'x 157 (2d Cir. 2001), that "[i]t is entirely conceivable that Plaintiff[']s state-law claims against Roe are pre-empted, given that they contradict the findings of the process Doe contracted for, under the umbrella of Title IX, and resolution of their truthfulness requires re-opening the Title IX process."  Roe does not advance this argument on appeal, so we do not decide the issue here.

376 U.S. 254, 256 (1964) (full-page advertisement in a national newspaper). We do not lightly apply a framework commonly applied to public statements about third parties in this most personal of contexts: a conversation with intimates about your own possible sexual assault. Nor do we disregard the risk that victims of sexual assault could be dissuaded from sharing their experiences—and so from seeking support, justice, and treatment—by looming defamation suits.

Ohio law is capable of this task. Because these statements to friends do not bear a "reasonable relation" to the disciplinary proceedings, *Surace v. Wuliger*, 495 N.E.2d 939, 943 (Ohio 1986), we apply Ohio's test for qualified privilege. The elements of qualified privilege "are fully satisfied by showing that the relationship of the parties to the communication is 'such as to afford a reasonable ground for supposing an innocent motive for giving information and to deprive the act of an appearance of officious intermeddling in the affairs of others.'" *McCartney v. Oblates of St. Francis de Sales*, 609 N.E.2d 216, 224 (Ohio Ct. App. 1992) (emphasis omitted) (quoting *Hahn v. Kotten*, 331 N.E.2d 713, 720 (Ohio 1975)). Roe described (albeit, according to the complaint, incorrectly) an incident that personally involved her to a small number of friends and roommates who shared an interest in her health and well-being. Doe does not allege that she shared that description widely. Roe's version of the events, moreover, bears many similarities to Doe's—Doe agrees the sexual encounter occurred, and he told the interviewer that Roe said, "I don't think I want to do this," as the encounter was ending. At the hearing, the Board determined that Roe's description of events was more likely than not to be true. *See McPeek*, 882 N.E.2d at 454–55. Doe must therefore allege actual malice. *See McCartney*, 609 N.E.2d at 224. To do so, he relies on a legal conclusion in his complaint, that "Roe made her false and non-privileged statements negligently, with knowledge of their falsity, or with reckless disregard for their truth or falsity."

"[W]e 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

Under these circumstances, the district court properly dismissed the defamation claims.

### 3. Intentional Infliction of Emotional Distress

Doe next argues that the district court should not have dismissed his claim against all Defendants for intentional infliction of emotional distress. To state such a claim under Ohio law, Doe must allege that:

> (1) the defendant intended to cause, or knew or should have known that his actions would result in serious emotional distress; (2) the defendant's conduct was so extreme and outrageous that it went beyond all possible bounds of decency and can be considered completely intolerable in a civilized community; (3) the defendant's actions proximately caused psychological injury to the plaintiff; and (4) the plaintiff suffered serious mental anguish of a nature no reasonable person could be expected to endure.

*Morrow v. Reminger & Reminger Co.*, 915 N.E.2d 696, 712–13 (Ohio Ct. App. 2009).

This test is not satisfied merely by showing "that the defendant has acted with an intent which is tortious or even criminal"; rather, Ohio courts find liability "only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 713–14 (quoting *Yeager v. Local Union 20, Teamsters*, 453 N.E.2d 666, 671 (Ohio 1983)). As described above, Swinton, the University, and NCHERM complied with the requirements of Title IX and the Student Handbook. Even assuming the procedures were flawed, their conduct is neither outrageous nor atrocious. *See Miami Univ.*, 882 F.3d at 599 (6th Cir. 2018) (concluding that even though the plaintiff had plausibly alleged an erroneous outcome under Title IX, the conduct did not "shock the conscience" for purposes of a due process claim). Roe instigated sexual harassment proceedings after discussing the incident within her immediate circle of friends; the Board then found her description of the events more credible than Doe's. Neither discussing a sexual

encounter with friends—even inaccurately—nor filing a complaint that is ultimately accepted as more likely than not to be true exceeds the bounds of decency. *See Hanly v. Riverside Methodist Hosp.*, 603 N.E.2d 1126, 1132 (Ohio Ct. App. 1991) (publishing that the plaintiff was discharged for sexual harassment, even if it exceeded the bounds of qualified privilege, "was not so extreme and outrageous to support a claim for intentional infliction of emotional distress"). The district court properly dismissed this claim.

### D.   Declaratory Judgment

Last of all, Doe argues that his declaratory judgment claim against Dayton for violation of the Handbook and Title IX should not have been dismissed. The Declaratory Judgment Act is procedural in nature and "does not create an independent cause of action" that can be invoked absent some showing of an articulated legal wrong. *Davis v. United States*, 499 F.3d 590, 594 (6th Cir. 2007). Because Doe's other claims have been dismissed, his declaratory judgment claim likewise fails.

### III.  CONCLUSION

For the foregoing reasons, the district court's decision dismissing all claims is **AFFIRMED**.